Julius W. **HOBSON**, individually and on behalf of Jean Marie Hobson and Julius W. Hobson, Jr., et al., Plaintiffs,

v.

Carl F. **HANSEN**, Superintendent of Schools of the District of Columbia, the Board of Education of the District of Columbia, et al., Defendants.

Civ. A. No. 82–66.

United States District Court,
District of Columbia.

Dec. 14, 1970.

area of far Southwest Washington, D.C., seeks further implementation and compliance with the decree of this court in Hobson v. Hansen, D.D.C., 269 F.Supp. 401 (1967), *affirmed, sub nom.* Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969). A new elementary school has recently been completed in far Southwest Washington, where formerly a single school served the entire community, and plaintiffs in intervention allege a constitutional infirmity in the decision of the Board determining which children will attend the new school and which will have to continue at the old.

I

Plaintiffs in intervention filed this suit in July 1970 after the Acting Superintendent of Schools had recommended and the Board had approved a boundary line plan whereby the area formerly served by 25-year-old W. B. Patterson Elementary School was to be divided into two school districts. Under this plan, students residing north of Elmira Street, S.W., and third-through-sixth-grade students residing at the Bellevue Naval Station, are currently attending the newly completed Madeline Leckie Elementary School; students residing on and south of Elmira Street, and third-through-sixth-grade students residing at Bolling Air Force Base, are attending Patterson. Plaintiffs in intervention seek to enjoin the school system from dividing the elementary school attendance area by Elmira Street on the ground that this boundary line creates a racial and socio-economic imbalance as between Leckie, Patterson, and Congress Heights Annex School on Bolling Air Force Base where all military family first and second graders from both Bolling and Bellevue still remain.

As an alternative to the Board's boundary line plan, plaintiffs advocate a feeder or pairing plan whereby all students in the far Southwest area (including all students except kindergartners at Congress Heights Annex) would attend

John A. Bleveans, Washington, D.C., for plaintiffs in intervention.

Thomas Nedrich, Asst. Corporation Counsel for District of Columbia, for defendants.

J. SKELLY WRIGHT, Circuit Judge:*

This action in intervention against the District of Columbia Board of Education brought by 13 parents of students or prospective students in the District of Columbia school system who reside in an

* Sitting by designation pursuant to 28 U.S.C. § 291(c) (1964).

Patterson for Grades 1, 2 and 3, and Leckie for Grades 4, 5 and 6. Plaintiffs cite this court's 1967 decision in *Hobson* to support their contention that defendants' interest in continuing its policy of organizing its elementary schools along traditional grade lines does not outweigh the educational advantages apparent in the pairing plan or defendants' obligation to equalize the objectively measurable aspects of its schools for the students who attend them.

On August 28, 1970, before the new school was opened, this court heard argument and testimony on both plaintiffs' motion for a preliminary injunction against implementation of the boundary line plan and defendants' motion for summary judgment. In addition, at the suggestion of and accompanied by counsel, the court surveyed Leckie, Patterson and Congress Heights Annex, as well as the neighborhoods on both sides of Elmira Street, in an effort to determine visually whether there was significant economic disparity between the Leckie and Patterson attendance areas, as set under the Board's boundary line plan. As to racial disparity, the evidence submitted at the August 28 hearing consisted of widely varying predictions from both sides as to what the racial population of the two schools would be when and if the Board's boundary plan was put in operation. To avoid making a judgment based on speculation as to this crucial aspect of the case, the court decided to wait until such time as students were actually in attendance at Leckie and Patterson under the boundary line plan, when an accurate measurement of racial integration could be made. On September 28, 1970, the Board submitted current information regarding pupil enrollment, with a racial breakdown, at Leckie, Patterson and Congress Heights Annex, pursuant to this court's order of August 31, 1970. On October 19, 1970, both sides filed proposed findings of fact and conclusions of law, putting the issues concerning racial and economic integration at the schools in question squarely before this court for disposition.

II

Before proceeding further, the court will briefly review the relevant teachings of its 1967 *Hobson* opinion, in order to provide the necessary background for consideration of the specific facts and issues in this related action. The original litigation in this case, brought in behalf of Negro as well as poor children generally in the District's public schools, tested the compliance of the Board with the principles announced in Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884, (1954), Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and their progeny. The basic question presented was whether the District school system was operated in such a way as to deprive black and poor public school children of their right to equal educational opportunity with white and more affluent public school children. This court concluded that it was, and in support of this conclusion it made two findings of fact which bear directly on the present action: that

> "[r]acially and socially homogeneous schools damage the minds and spirit of all children who attend them—the Negro, the white, the poor and the affluent—and block the attainment of the broader goals of democratic education, whether the segregation occurs by law or by fact,"

and that

> "[t]he scholastic achievement of the disadvantaged child, Negro and white, is strongly related to the racial and socio-economic composition of the student body of his school. A racially and socially integrated school environment increases the scholastic achievement of the disadvantaged child of whatever race."

269 F.Supp. at 406. With specific reference to remedies, the court had this to say:

> " * * * The use by the defendants of the neighborhood school pol-

icy, intentionally manipulated in some instances to increase segregation, is the primary cause of the pupil assignment discrimination. Because of the 10 to one ratio of Negro to white children in the public schools of Washington and because the neighborhood policy is accepted and is in general use throughout the United States, the court is not barring its use here at this time.

"In preparing the plan to alleviate pupil segregation which the court is ordering the defendants to file, however, the court will require that the defendants consider the advisability of establishing educational parks, particularly at the junior and senior high school levels, school pairing, Princeton and other approaches toward maximum effective integration. * * * "

269 F.Supp. at 515.

## III

At the time of the August 28 hearing, the court had before it an affidavit by Mr. Benjamin J. Henley, then Acting Superintendent of Schools, which presented a chart indicating the projected pupil population, by race, at both Leckie and Patterson under the approved boundary line plan, and also under the feeder or pairing plan proposed by the plaintiffs in intervention. According to Mr. Henley's projected figures, the boundary plan would produce student populations at Leckie and Patterson of equal sizes and virtually identical black/white ratios.[1] On the other hand, the feeder plan was projected to produce an enrollment at Leckie which would be substantially more white than that of Patterson. These projections were in confusing conflict with the allegations and submissions of plaintiffs, in their motion for a preliminary injunction, to the effect that the boundary line plan might produce a Leckie that was 95 per cent white and a Patterson which would be 99 per cent black. Given this direct and then unresolvable dispute over the underlying facts upon which the request for relief was primarily based, the court had no alternative but to postpone judgment and to request that the Board provide accurate figures as to the *actual* enrollments at Patterson and Leckie, with a racial breakdown, at the earliest possible moment after the reconvening of school in the fall. Now that all the evidence on this as well as the other issues presented is in the record, the court makes the following findings:

1. As the Board contends, the Acting Superintendent of Schools made a good faith effort to touch base with the local community in determining the boundaries for Leckie and Patterson. However, whether community sentiment was accurately reflected by the boundary determination that was made cannot definitively be determined from this record.[2] The Board characterizes the plain-

1. At the hearing, the relevant colloquy was:

> MR. NEDRICH: Your Honor, we have proffered with our affidavit projected black-white pupil ratio for each of the two schools; and they come out to an almost mathematical 2 to 1 black-white ratio in both schools. If you change this many students in each school, out of a projected enrollment of 660 students you would come out with 66⅔ percent black and 33⅓ percent white. This includes the projected enrollment from Bolling Air Force Base and Bellevue Naval Station.
>
> THE COURT: When will these projections become a reality?

> MR. NEDRICH: When the school term opens on September 10th.

2. The complexity of this problem is indicated by the following testimony, given by Mr. James L. Talbert, Jr., Director of Administration for the Elementary Schools of Washington, D. C., under cross-examination, concerning the makeup and formation of the parental committee which recommended the boundary plan:

> Q You referred to a large group and a dissident group and various other groups. When you referred to the large group, who did you mean by that?
>
> A This is the group that was set up by the committee of twenty-one and the

names are right here (indicating to a paper). This was the group that selected or elected Mr. William Taylor as Chairman of the Group to Work on the Boundaries.

Q Do you know how this Committee of Twenty-One was selected?

A No. At a meeting in 1969 in the Board Room when we called in interested citizens, the principals of schools called in representatives from the community and the P.T.A. The groups wanted to set their own boundaries, and since this is the purpose of community participation, we agreed to let them. And I was to act as a consultant. And, every now and then, I would be called for such things as block counts, et cetera. I was not at the meeting when Mr. Taylor was elected as Committee Chairman.

Q How do you know he was elected as Committee Chairman?

A Well, this would have to be hearsay, because he said he was elected Chairman of the Committee.

Q He told you he was elected chairman?

A Yes.

Q Were you aware of a vote taken to elect him chairman?

A No.

Q Are you aware of any statements made by anybody that Mr. Taylor, in fact, was not elected chairman of that group and just, more or less, took it over?

A No, I am not familiar with that at all.

Q Now, Mr. Talbert, if you want to consult a group in a school system or in a community that has a stake in community participation that you want to achieve, and you want to reach the group that has demonstrated the most concern with the schools and has the most knowledge of the schools, why don't you go to the P.T.A.? Why did you set up these separate groups? Why didn't you go to the P.T.A.?

A I am not quite sure I understand what you mean. This group has P.T.A. members and—

Q That is not my question. You say it is a matter of policy for these committees to be set up. Was there ever a policy to consult the P.T.A. in a school system when a boundary change was involved? Why do you bypass the P.T.A.?

A There are many members of the community who don't belong to the P.T.A. And I have found that we have to be most careful and we have asked the principals to send notices to everybody in the community to come in—just like at Davis School—and everybody in the community who is interested comes in and then the committees are formed.

Q But in this case do you think Miss Iascone sent notices to everyone in the community?

A No, I don't think that.

Q Do you know?

A I don't know whether she did or not. All I know is that they said they wanted to form a committee.

Q Who said that?

A The people at the meeting.

Q How were they chosen? How would they know to appear?

A The principals of the schools involved called some of them. I called about two or three because I had calls from people in the area who asked me when the school was going to open; and I told them that the boundary would be formed at a reasonable time. And then they said, when you have the meeting to form the committee let me know.

Q I don't know who these people are, Mr. Talbert.

MR. NEDRICH: Your Honor, may I interject right here? I really don't think this is so material at this point. I might say that if it had been shown that none of the plaintiffs or people in sympathy with plaintiffs never had an opportunity to participate in the setting up of the boundaries we would have a problem. But, as we have seen from Mr. Seabron's own testimony—and he is a worthy advocate for the feeder plan—I don't think any prejudice has been shown in this respect; and I think it is taking up the Court's time.

THE COURT: I will overrule the objection. I think he has a right to find out how this committee was made up. Just tell us simply how was the committee first started, the so-called big committee—the community committee.

THE WITNESS: The only thing I can tell you about that is that when the group, after we met at The Presidential Building—and I don't remember the month in 1969—there was a group of P.T.A. members and other community representatives. And it was indicated that they wanted * * * to form what they called a "Committee of Twenty-One". I believe they called it a Committee of Twenty-One because they have Committees of Twenty-One to help decide how new buildings would

tiffs here as representatives of a highly vocal minority advocating the pairing plan, while plaintiffs' evidence suggests that the Board's effort to solicit community sentiment was more formal than substantive. The evidence as a whole is by no means inconsistent with the hypothesis that a non-majoritarian group of more aggressive, better informed, predominantly whiter and more affluent parents took over the role that should have been played by the larger community and endorsed a boundary plan which directed its own children to the newer and better equipped school. Be that as it may, both parties are in agreement that whether community approval exists for the boundary plan is an issue clearly subsidiary to whether the plan as formulated and implemented is in compliance with the constitutional requirement of equal educational opportunity for all children irrespective of race or economic status. If the plan discriminates along either racial or economic lines, it is, of course, constitutionally unacceptable regardless of whether it is endorsed by a legitimate majority of parents of the children attending the schools.[3]

2. The transcript also contains testimony by Miss Iascone, current principal of Patterson, concerning the cost and other practical difficulties that would be involved in a switch from the boundary plan to the feeder plan. Here again, such testimony is telling only when the two plans are seen as equally reasonable alternatives, one of which has been chosen by the Board in its administrative discretion. Defendants do not deny that an argument based on the difficulties involved in switching from the already established boundary plan to the pairing plan must yield to a showing that such a plan was established in violation of basic constitutional protections, particularly so where, as here, plaintiffs' opposition to the present boundary plan was communicated to the Board prior to the implementation of the plan.

3. With regard to the relative desirability of the two elementary school facilities, it is manifest that Leckie is preferable to Patterson in every respect. Leckie is a new school of modern design opened for the first time for the 1970–71 school year. It is a bright, cheerful, air conditioned, partially carpeted fa-

be constructed. But this was not really a proper name for that committee. All they needed to do was form a committee of community people to set the boundaries. They called it a Committee of Twenty-One although there are about twenty-six names on it. When they left us I understood I was to be a consultant but I did not meet with them when they set up that committee.

BY MR. BLEVEANS:

Q Back to the Court's original question, Mr. Talbert, and mine also, how was that committee chosen? How did the members of that committee become members of that committee?

A I can't answer that.

Q You don't know?

A I don't know.

Q Okay. Do you know for a fact whether or not the people who are listed on this paper that you offered were, in fact, members of the committee? Do you know all these people?

A No.

Q So all you know about the membership of the Committee of Twenty-One is what is represented on this sheet here as the membership, and you don't know any more about the committee members as to whether or not they were on the committee than what this sheet says?

A No.

Q Who made this sheet up, do you know?

A The members of the Committee of Twenty-One. I know some of the people on there; yes. It isn't that I don't know people on there, but I don't know that all of them were elected or selected.

Q So we don't know how the committee was formed?

A I really couldn't answer that; no.

3. As Mr. Justice Jackson wrote for the Supreme Court in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943), "fundamental rights may not be submitted to vote; they depend on the outcome of no elections."

cility containing such specially equipped rooms as a speech clinic; a reading clinic; a health suite; a multipurpose classroom with a stove, sink and refrigerator; an all-purpose room with an adjoining kitchen that can be used as a cafeteria or gymnasium; double or team teaching classrooms; two kindergarten rooms; and two pre-kindergarten rooms; as well as normal elementary school classrooms. The playground or outdoor physical education area of Leckie is composed of an enclosed area with modern playground equipment and toys specially suited to preschool age children and a separate area with basketball courts and other equipment for older children. In addition, Leckie is immediately adjacent to Fort Greble Park, which is equipped with two softball diamonds, a football field, swing sets, climbing equipment, a paddle ball court, slides, and other equipment for students at children's outdoor play. As is the case with playground equipment, Leckie will also have all *new* books. Patterson, on the other hand, is a 25-year-old school greatly surpassed by Leckie in appearance, cheerfulness and educational facilities. Patterson is not air conditioned,[4] and it does not contain any of the specially equipped rooms that are present at Leckie. Its total playground facilities consist of one comparatively small, uneven, asphalt-covered area, with two rusty sets of monkey bars and a single basketball goal.[5] Were the Patterson and Leckie facilities approximately equal in quality, the claim that the Board's boundary plan would divide the student populations of these schools along socio-economic and racial lines would still raise a serious consti-

4. The difference between the two schools in this respect is more than one of mere comfort, although comfort itself is decidedly important. Both Patterson and Leckie Schools are also on the approach route to National Airport, and there was testimony at the hearing to the effect that at Patterson, during the hot months when it is necessary for school windows to be opened because of the absence of air conditioning, the noise from landing and departing airplanes regularly interrupts conversation and makes communication very difficult.

5. The August 12 affidavit of Benjamin Henley takes the position that there will be no appreciable differences in student services available between Patterson and Leckie for the 1970–71 school year. Support for this position is as follows:

"There will be no appreciable differences in student services between Patterson and Leckie for the 1970–71 school year. Each school will have kindergarten through sixth grade classes. Leckie has an all-purpose room which will serve as an auditorium, cafeteria eating room, or an indoor gymnasium. Patterson has an auditorium and a separate eating room facility, both of which can be used as indoor gymnasiums. In this regard, the only difference is that the Leckie all-purpose room has a cafeteria-type kitchen. Hot lunches for Patterson students who qualify for the Food Service Program will be prepared at Leckie and then transported to Patterson. Leckie has a nurses station, or, more correctly, a health suite, whereas Patterson has none. However, capital construction plans for the years 1971 through 1973 contain provisions for the placement of both a health suite and a cafeteria-type kitchen at Patterson. Leckie has two empty rooms which are designated as reading clinics. Patterson has no rooms which are so designated. However, with overcrowding no longer a problem at Patterson, rooms can now be so designated if the need arises. In this regard, it is important to point out that a room becomes a reading clinic when a reading teacher, who is usually itinerant, is assigned to a particular school on the basis of availability and need. A reading clinic is not dependent upon mechanical teaching equipment."

As stated above, this court finds, contrary to defendants' pleadings, that there *are* "appreciable differences in student services available between Patterson and Leckie for the 1970–71 school year." Aside from the obvious differences in the newness and brightness of facilities between a recently completed school and a 25-year-old school, the court also notes that defendants' case for a basic equality of services depends upon a number of capital constructions and rearrangements which, given the difficult financial constraints upon the school board, cannot be counted on as a certainty even in those cases where they are currently projected for completion within the next few years. *See* Transcript at 120, 149.

tutional issue. Obviously, the claim becomes all the more serious when the facilities are as different as they actually are, and when the gravamen of the complaint is that a less affluent and more predominantly black student body is being relegated to the clearly less desirable facility.

4. Of all the evidence presented in this case, that concerning the socio-economic differences between the Leckie and Patterson attendance areas, as drawn under the boundary plan, remains the most conflicting and difficult to appraise. Defendants stress that the United States Census Bureau classified the area generally served by Patterson and Leckie as one tract—73.7 in the District of Columbia. The latest available statistical information shows that in 1959 this tract had a median family income of $6,474, and defendants assert that there are no discernible "poverty pockets" in any part of the area. This position is buttressed by statistics showing that during the 1969–70 school year, of nearly 1,300 students attending Patterson, only 38 qualified for free lunches in the school system's Food Service Program under criteria established by the United States Department of Agriculture. While stating that there is a "somewhat larger" ratio of single family dwellings north, as opposed to south, of Elmira Street, and a "somewhat larger" ratio of multifamily dwellings south, as opposed to north, defendants assert that this housing development pattern does not reflect and has not produced any observable socioeconomic differences in the boundary plan's two attendance areas.

Plaintiffs in intervention assert that there are 286 single family residential structures in the attendance area north of the Elmira Street boundary line, and that single family residential structures dominate the area north of this line. Conversely, plaintiffs claim, there are only 53 single family residential structures south of Elmira Street, while all other family housing structures are multifamily garden apartments or high rise apartments. They argue vigorously, in contrast to defendants, that there is a significant socio-economic difference in the two attendance areas as presently constituted.

Although the evidence is far from clear on this question, the court was particularly impressed with testimony of Mr. Shedd H. Smith, Director of Community Renewal, Office of Community Programs, District of Columbia, who appeared as a witness for plaintiffs under a subpoena. The Office of Community Renewal is responsible for preparing detailed neighborhood analyses, documenting conditions, and initiating programs to better stabilize neighborhoods. Under Mr. Smith's direction, the Office had prepared in 1969 a land use map showing the type of housing that exists in the far Southeast area of Washington. When asked whether he was qualified to make a judgment as to any differences which might exist between the residences north and south of Elmira Street, the witness responded that he did have opinions based upon the land use map prepared by his staff and also upon a special study of the general far Southeast Washington area over a period of 15 months. The following colloquy then took place:

THE COURT: From the fifteen months of exposure you have had to this particular area, do you have an opinion as to what difference there is, if any, between residences north and south of Elmira Street?

THE WITNESS: * * * I think the far southeast report [Washington's Far Southeast '70] which was used as an exhibit would indicate, in general, that there is, in fact, an incident of a more stable family occupant throughout single-family low-density areas than apartments. I think this is the basis and most significant finding, that where there is single-family homes we identified with whole families we have fewer social problems, with the exception of the luxury apartments. The older apartment units are, generally, not as well maintained. They are a more reason-

able rental rate and there is a greater degree of transients in those older apartments than in the homes or more luxury apartment units.

\*     \*     \*     \*     \*

THE COURT: Now, suppose you give us your overall opinion as to whether the living units in the area north of Elmira are more desirable from a socio-economic standpoint than the living units south of Elmira?

THE WITNESS: I would say that the living units north of Elmira are more desirable and, again, I would refer to the "Far Southeast Report". The basis of this is that one of our problems we have here with our single-family area is a total city responsibility to maintain that area, particularly with respect to refuse collection, street cleaning; and in the units where we have three or four apartment units it is the individual responsibility of owners. There is no coordination of refuse collection. Therefore, there is almost a visual change between the apartment complex area and the single ownership area, because where there is a degree of co-ordination of refuse and cleanup it is a difference like day and night, with the exception of your more recent luxury apartment. In the older areas where they do not have the economics to maintain a full-time maintenance staff there is a difference between the quality of life in the apartment complexes as compared to the relatively single-family home.

The court's own survey confirms the testimony of Mr. Smith. Despite the existence of two luxury apartment developments in the Patterson area,[6] the general pattern is one of detached, single family homes north of Elmira Street, and of small apartment complexes to the south. There is a significant difference between the apartment complex area and the single ownership area because of the higher degree of maintenance performed in the single family residential area. The court accepts the testimony of Mr. Smith that single family, low density housing areas generally have more stable family occupants than high density apartment areas, and that rental charges for most of the apartments south of Elmira Street are substantially lower than the rental charges for the few homes that are rented north of Elmira Street. The court concludes that the living units in the area north of Elmira Street are more desirable from a socio-economic standpoint than those to the south, and that the current school boundaries do, therefore, cause some degree of discrimination along socio-economic lines.

■■ 5. The recent submission by the Board of actual enrollment figures, by race, at Patterson, Leckie and Congress Heights Annex, as distinguished from the projections filed in connection with the August 28 hearing, is, however, this court's real source of concern. According to the Board's August projections, the student populations at *both* Patterson and Leckie were to be 66⅔ per cent black.[7] In fact, the boundary line plan, now carried out, has produced a Patterson which is 88 per cent black, as compared with a Leckie which is 72 per cent black. Thus it appears that the Board made its districting decision on the basis of projected enrollment figures which have proved to be significantly inaccurate and which may have obscured important constitutional considerations. On this ground alone, reconsideration of the districting decision is required by this court's 1967 decision in *Hobson*.[8]

---

6. Windgate House High Rise Apartments and Windgate East Garden Apartment Complex.

7. *See* Note 1, *supra*.

8. The court notes that the projected enrollment figures suffer not only from inaccuracy but also because they have an air of *post hoc* justification about them. That is, putting their inaccuracy to one side, such projections do not appear even to have been considered until the boundary plan had already been formulated and come under attack. In this

regard the court notes with concern the testimony of Mr. Talbert (*see* Note 2, *supra*):

BY MR. BLEVEANS:

Q Are you aware, Mr. Talbert, or did you yourself, in consulting on the boundaries, use any land-use maps of the sort we have been using in the Court today?

A I have maps that are put out by the D. C. Engineers that I use in my office for boundaries. These are the maps that I used. And, in fact, Mr. Taylor purchased a large copy of the area of this map so that he could work with that.

Q Does that map indicate the type of housing or the racial patterns in the neighborhood?

A No, nothing like that.

Q Just the streets?

A Just the streets.

Q Do you know whether Mr. Hanley uses a land-use map or any other sort of map that would indicate housing or racial data as far as the patterns in the neighborhood?

A I couldn't answer that. I don't know that.

Q Have you ever seen one used or heard of one used?

A No, I haven't.

\*      \*      \*      \*      \*

Q How do you ascertain whether or not those boundaries do violate the mandate to maximize integration if you don't use a land-use map and you don't use a map to tell you where the black or white people live in the attendance area? How do you satisfy that requirement?

A Well, I don't think there is any way anyone can really determine exactly some of these points. But by conferring with the principals of the schools on such things, who know the area, this is the way I make my contacts on such things as that. And I had occasion to do this in this last boundary I set for the Whetherly School.

Though she is no doubt a very fine principal, this court must note that Miss Iascone, principal of Patterson, is not a qualified statistician and that, compared with the accuracy of a land use map or a census bureau survey, her attempt to measure the socio-economic distribution of her pupils was at best unscientific. As basic evidence of the socio-economic level of Patterson students, used by the school administration in formulating boundary lines which would be in accord with criteria set out in this court's 1967 *Hobson* opinion, Mrs.

Iascone's survey was of very questionable utility:

Q Miss Iascone, you referred earlier to a study that had been completed pursuant to a request, I think, from the Department of Health, Education and Welfare. You are also familiar with Mr. Henley's affidavit. If you aren't I will show it to you. His affidavit has an attachment, some pages from that study. Are you familiar with this affidavit, Miss Iascone? Have you seen this?

A No, I haven't.

Q Well, I will represent to you that there is an attachment to this affidavit which is referred to in it. And it says: "The statistical survey made for the Department of H.E.W. by the principal indicates approximately 69% of the families of children attending Patterson had incomes in excess of $5,000.00 per year, and that less than 7% of the families were on public welfare (see Exhibit B attached hereto)."

Now, Exhibit B is some collected pages from what appears to me, anyway, a study done for H.E.W.

A Yes.

Q And on numbered page 14 there is an inquiry that is directed to you and has the name and title of person filling out this report. Did you, indeed, fill out this report?

A Yes, I did.

Q Question No. 28 states: "What proportion of the parents of the pupils in this school do you estimate to be"— and then it goes on to say—"Economically very poor; e. g., on welfare, in need of special food and other assistance; moderately poor, unskilled or low-skill jobs; moderately well off; moderately poor; quite well off, live in expensive houses, etc."

Now that first category, Economically very poor—

A I said less than 1%. It is 7%.

Q Okay. Moderately poor—24%.

A Yes.

Q Moderately well off—66%.

A Yes.

Q Quite well off or very well off—3%.

A Yes.

Q It says round all percents to the nearest figure. Now, in answering that question—it said, "What proportion of the pupils in this school do you estimate to be" in those various categories— you filled in the percentages. Can you tell the Court how you arrived at those percentages?

A Well, as I said before, I made this survey in which I asked questions about

The court also finds that the Board's projections may have caused the Board, in making its decision, to underestimate the advantages of the pairing plan. Counsel for defendants asserted at the hearing that "we get a better [projected] ratio of black to white under the boundary plan which has been adopted by the Board of Education than the alternative * * * feeder plan proposed by plaintiffs." Clearly the best plan of all, however, for the purpose of maximizing integration would be the pairing plan, with first and second graders from Congress Heights Annex included. Under this plan, the Leckie population would change slightly from 72 per cent black to 74 per cent black, but the population of Patterson, because of the inclusion of a Congress Heights Annex first and second grade contingent which is currently 86 per cent white, would go from 88 per cent black to 71 per cent black.[9]

who worked as Federal and District of Columbia employees—I admit I am not a statistician, but I took the total number and divided it by the student enrollment and got my percentages that way.

Q With regard to whether or not a person is employed by the District of Columbia. If he was, did that put him in one of those categories or did you seek to find out what sort of a job he had with the District of Columbia?

A I don't recall. I am sorry.

9. The information on which these percentages are based comes from the most recent submission by defendants, dated November 27, 1970. At the hearing, the following interesting testimony was given with respect to the Congress Heights Annex:

BY MR. BLEVEANS:

Q Mr. Talbert, did you consider this sizeable group of white students that attend Congress Heights Annex in this plan that has been approved by the Board of Education, and the effect that large group or sizeable group of white students would have if they came into these two schools rather than staying in Congress Heights Annex?

A I certainly did consider that. I talked to the principal of the school and also to one of the members from the service area; and this was one reason we decided to have the children from one of the service areas, the Bellevue Area, go to one school and the children from the Bolling Area go to another school.

Q My question though was how about this group [all first and second graders] that has been excluded from the formula, this group of white students at Congress Heights Annex?

A Those are all service children, and Congressman Rivers is the one, from the way I understand it, who is responsible for those demountables being down there on that base. And this is something that is not within my jurisdiction to handle. Only service children attend those demountables down there—no other children can go down there.

Q Well, we will get into the reason why they can't in a minute. But those students are students of the D. C. Public Education System, are they not?

A Yes.

Q. Is there any exception that you are aware of in this Court's Order that says consider all kids but don't consider the military kids in your obligation under this Court's Order and the Constitution to maximize integration in the schools?

MR. NEDRICH: Your Honor, we are clearly getting into legal opinion. We have no information as to whether or not Mr. Talbert has read this Court's Opinion and Order and whether or not he is an expert on the Constitution.

MR. BLEVEANS: We can get into the area where he has been instructed to follow guidelines.

THE COURT: I think it is important only as to facts. Now, as I understand it, it is clear that the Congress Heights School is a school of the District of Columbia and is run by the District of Columbia School Board; is it not?

THE WITNESS: It is run by the School Board, this is my understanding. But it is my understanding that only service children can attend those classes on that base. And I have never considered anything in connection with the classrooms on the base except that we knew they could only hold so many children. So it was decided to let first and second grade children go there and those from the third through the sixth from Bellevue to Leckie and those from the third through the sixth from Bolling to go to Patterson. We felt this would be an equal distribution of those children and cause the integration of those schools to be done equally. As far as

The court would also note that the significant differences in maximization of racial integration under the boundary and pairing plans are further accentuated by the less striking but still important differences in maximization of socio-economic integration. The net effect of the boundary line plan as compared with the pairing plan is to send a relatively blacker and less affluent student body to a school which suffers from all the deficiencies of its age, while a relatively whiter and more affluent group of students is assigned to a new school which is clearly preferable to the other in every functional respect.

Other obvious points in favor of the pairing plan, but which remain matters of judgment within the discretion of the school board, take on additional significance in view of the current plan's constitutional weaknesses. Under the pairing plan, as plaintiffs have pointed out, every child in far Southwest Washington during some part of his elementary school life would have an equal opportunity to enjoy the pleasures of a modern school such as Leckie; there would be no danger of stigma attaching to those students who under the boundary line plan would have to attend 25-year-old Patterson for all six years of their elementary school education; the older children would be assigned to Leckie, which has special playground equipment well suited to their age level,[10] and which is also directly adjacent to Fort Greble Park with its softball diamonds, football field, and other facilities for older group games. The two schools being only a block apart on the dividing line between the two school districts, countervailing considerations in favor of "neighborhood" schools are nonexistent.

In view of these findings, and especially of the fact that the Board's decision was premised upon enrollment projections which have proved to be inaccurate to the point of obscuring important constitutional considerations, it is ordered:

1. That the Board reconsider the boundary line and pairing plans in view of their actual effect on the maximization of socio-economic and racial integration.

2. That the Board file in the record in this case, on or before March 15, 1971, the results of its reconsideration of the districting problem, with reasons in support of whichever plan it chooses to adopt.

3. That the Board give further consideration in this connection to the advisability of integrating the 227, 85 per cent white first and second graders from Congress Heights Annex into the general student population of Leckie and Patterson.

---

doing something about those other children on that base, it never crossed my mind that I could have any power to do anything with those children.

Q But in following the points that are to be taken into consideration according to this paper, the boundary consideration is how can socio-economic and/or integration goals be furthered through this change.

A Well, we did, as I said, send about half of the children to one school and about half to the other school.

Q So that you decided to exclude this other group of white children at Congress Heights Annex?

A I don't consider myself excluding them from anything. It is just that I don't have any jurisdiction over them and I don't know who has.

MR. BLEVEANS: I think we have established that, Your Honor.

THE COURT: I will ask a few questions about that. Do District of Columbia School Board teachers teach in that school?

THE WITNESS: Yes.

THE COURT: Do you know whether the money to operate that school comes out of District funds?

THE WITNESS: I would feel that the money does probably come from those funds; yes.

But I understand that whenever anything is done with reference to those schools the Education Officer down there tells me he has to send information to Congressman Rivers on every move they make down there to see if this is agreeable with him.

10. Under the pairing plan, both Leckie and Patterson would continue to serve the same kindergartners now assigned to them under the boundary line plan.