468 F.2d 1096
 152 U.S.App.D.C. 39
 James BULLUCK et al., Appellants,
v.
Walter WASHINGTON, Commissioner of the District of Columbia, et al.
Jerome and Maura FREIBAUM et al., Appellants,
v.
Walter WASHINGTON, Commissioner of the District of Columbia, et al.
 Nos. 24862, 24863.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 22, 1971.
Decided Jan. 19, 1972.
As Amended Feb. 8, 1972.
Rehearing En Banc Granted March 7, 1972.
On Rehearing En Banc July 14, 1972.
 
 Mr. John B. Jones Jr., Washington, D. C., with whom Messrs. Rodney E. Gould and S. William Livingston, Washington, D. C., were on the brief, for appellants in No. 24862.
 Mr. William L. Taylor, with whom Mrs. Harriett R. Taylor and Mr. Roger S. Kuhn, Washington, D. C., were on the brief, for appellants in No. 24863.
 Mr. David P. Sutton, Asst. Corp. Counsel for the District of Columbia, with whom Messrs. C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, were on the brief, for appellees.
 Before ROBINSON and MacKINNON, Circuit Judges, and DAVIES,* United States District Judge for the District of North Dakota.
 MacKINNON, Circuit Judge:
 
 
 1
 Appellants instituted these suits in the United States District Court seeking a declaratory judgment that Section 401(2) of the D.C.Revenue Act of 1968[1] was unconstitutional and an injunction against its enforcement. Because they were seeking to enjoin an act of Congress, appellants requested convocation of a three-judge district court.[2] Holding that the constitutional question presented was insubstantial, a single district judge denied appellants' request for a three-judge court and granted appellees' motion to dismiss the complaint.[3] This appeal followed and we affirm.
 
 
 2
 Accepting as true for purposes of this appeal, the factual allegations of the complaint,[4] it appears that the Parent Teachers' Association of the Bannockburn School conceived a plan [hereinafter the "Bannockburn Plan or Plan"] by which school children in the predominently black Meyer Elementary School in the District could be educated in the predominently white Bannockburn School in suburban Maryland. Designed to operate on a voluntary basis, the Plan, in effect, was an invitation to parents of Meyer School students to enroll their children in the Bannockburn School.[5] Approval for the Plan was sought and received from the Superintendent of Schools for Montgomery County and from the Montgomery County School Board.
 
 
 3
 On June 26, 1968, the District of Columbia School Board approved the Plan and agreed to provide the funds necessary for its implementation.[6] Some time thereafter, Section 401(2) was inserted in the District's pending revenue bill by the House Committee on the District of Columbia. As enacted,[7] the Section provides:
 
 
 4
 Sec. 401. No funds appropriated for the District of Columbia may be used-
 
 
 
 * * *
 (2) for the cost of education (including the cost of transportation) of any individual in an elementary or secondary school located outside the District of Columbia except (A) any handicapped individual for whom education facilities do not exist in the public school system of the District of Columbia and (B) any individual under the care, custody or guardianship of the District of Columbia placed in a foster home or in an institution located outside the District of Columbia.[8]
 Appellants claim that this Section violates the Due Process clause of the Fifth Amendment[9] because it was motivated by the desire of Congress to keep black school children from the District of Columbia out of white Maryland schools, and, alternatively, because its inevitable effect is to thwart racial integration. To these contentions we now turn.[10]
 I. Scope of Review
 Preliminarily, we note two factors concerning this case. First of all, the issue before us is a quite narrow one. Since appellants' request for a three-judge court was denied, we must reverse if we conclude that the constitutional questions raised are substantial. As the Supreme Court stated in Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 1296, 8 L.Ed.2d 794 (1962):
 When an application for a statutory three-judge court is addressed to a district court, the court's inquiry is appropriately limited to determining whether the constitutional question raised is substantial, whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three-judge statute.[11]
 To conclude that the constitutional questions are not substantial, we must conclude that they are "obviously without merit" or that their "unsoundness so clearly results from previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy." Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 4, 78 L.Ed. 152 (1933).
 Secondly, appellants do not contend that the District of Columbia government is required to expend funds in support of the Plan.[12] Their sole contention is that the Due Process Clause forbids the District to refuse to expend such funds because of Section 401(2). Thus the issue of whether any substantial constitutional question would be presented by the District government's refusal to support the Plan financially for any reason other than the existence of Section 401(2) is not present in the case.
 II. Congressional Motives
 There can be little doubt that a valid exercise of congressional power will not be invalidated because the Congress had invalid motives when it passed the legislation in question. A long line of cases has affirmed and reaffirmed this principle in a variety of contexts.
 The reason that courts will nto go behind the face of legislation to hold it constitutionally void on such grounds rests on sound practical considerations regarding the nice balance between the judicial and legislative branches of Government. As the Supreme Court stated in United States v. O'Brien, 391 U.S. 367, 383-384, 88 S.Ct. 1673, 1682, 20 L. Ed.2d 672 (1968):
 Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit of sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.
 Appellants concede the force of the principles enunciated above and seek to remove this case from their grasp by an examination of the "legislative origin, context and purpose" of Section 401(2). They allege that the provision was inserted in the District's revenue bill in 1968 "within five days after the Bannockburn Plan was approved by the Montgomery County and District of Columbia School Boards and publically announced." They further allege that Section 401(2) appears in the context of Section 401(1), an "anti-bussing" provision that D.C.Revenue Act.[13] Finally, appellants allege that the report which accompanied Section 401(2) to the floor of the House makes it plain that the Section is aimed at eliminating the Bannockburn Plan.[14]
 The above circumstances, claim appellants, are sufficient to show that the "purpose" of Section 401(2) was to impede racial integration in schools. They further claim that no probing of the "motives" of the Congress is necessary to reach the conclusion they would have us draw from their allegations and that this court may thus look at the relatively objective criteria they have presented to determine whether the purpose of Congress in enacting Section 401(2) was legitimate.
 Distinctions between legislative purposes and motives have been recognized in a variety of contexts.[15] The distinction, however, is between what the legislature has actually done and why it has done so, for,
 [i]n a legal sense, the object or purpose of legislation is to be determined by its natural and reasonable effect, whatever may have been the motives upon which legislatures acted.[16]
 Thus, if what the legislature has done is constitutional, the reasons why it has done so are irrelevant.[17]
 Acceptance of appellants' arguments concerning the "purpose" of Section 401(2) would require us to resort to circumstantial evidence which tended to show that the Section was not simply a prohibition of extra-territorial expenditures of funds but was a prohibition of integration of the District's black school children with those of the white suburbs. In other words, we are asked to use such evidence as the basis for a conclusion (1) that Congress did not really care about the expenditure of funds for extra-territorial education but was concerned about integration and (2) that the statute is therefore unconstitutional.
 Appellants' suggested analysis does not change the fact that they are asking us to examine congressional motivations, for we are still asked to hold a statute unconstitutional because of the reason it was enacted. Whether these reasons are denominated "motives" or "purposes," they cannot provide us with a basis for invalidating an act of Congress valid on its face and in effect. A claim that they can is insubstantial.[18]
 III. The Effect of Section 401(2)
 We turn, then, to an examination of the Section's effect in an effort to determine whether there is a substantial question that that effect is to deprive appellants of a constitutional right. Still assuming for present purposes the truth of appellants' allegations, it is clear that the inevitable effect of Section 401(2) is removal of the possibility of the District providing financial support for the Bannockburn Plan[19] from appropriated funds. Clear also is that the Plan was designed to foster integrated education by allowing children in a predominantly (97.7%) black inner-city school to enroll in a predominantly white school in a foreign state. Finally, it appears that, with two exceptions to be discussed hereinafter, the Bannockburn Plan was the only operating plan which provided for education of District school children outside the District of Columbia. It does not follow, however, that the sum of these parts amounts to a substantial claim of the invidious discrimination prohibited by the Fifth Amendment.
 We note, first of all, that appellants have made no allegation that the Section on its face provides for racial discrimination between various groups.[20] Nor have they made any allegation that the Section is a sham which, under cover of surface neutrality, permits children of one race but not of another to obtain governmentally-subsidized education outside the District.[21] Instead, the first of appellants' two main arguments is that the effect of the Section is to place "a special burden upon District children seeking educational integration."
 In order to demonstrate that such a contention, by itself, does not raise a substantial constitutional question, we turn briefly to fundamentals. At the start of the Court's opinion in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 5-6, 91 S.Ct. 1267, 1271, 28 L.Ed.2d 554 (1971), Chief Justice Burger made the following observation:
 This case and those argued with it arose in states having a long history of maintaining two sets of schools in a single school system deliberately operated to carry out a governmental policy to separate pupils in schools solely on the basis of race. That was what Brown v. Board of Education [, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954),] was all about.
 Indeed it was. In Brown, of course, the Court held that school systems racially segregated by law were constitutionally impermissible. It did so because it concluded that
 [t]o separate [black children] from [white children] of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.[22]
 This being the case,
 [s]egregation with the sanction of law . . . has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system.[23]
 Based on these conclusions, the Court made its ultimate conclusion:
 Separate educational facilities are inherently unequal. Therefore, we hold that plaintiffs and others similarly situated . . . are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment.[24]
 To remedy this deprivation, the Court, in Brown v. Board of Education, 349 U. S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II), ordered the affected school systems to prepare and implement plans which would integrate their schools.
 If this seems a belaboring of the obvious, we do so only to illustrate the processes which led to the Court's conclusions in Brown and which are implicit, if unstated, in every case involving racial discrimination decided since that time. In brief the processes are these: The Constitution guarantees equal treatment under the law. Forced segregation on the basis of race, both by itself and with its attendant consequences, denies equal treatment under the law. Therefore forced racial segregation is constitutionally intolerable. The basic right, therefore, is equality under the law and the normal remedy for a violation of that right is an injunction removing whatever state action causes the inequality-in racial cases, the laws which provide for segregation by race. So familiar has this method of analysis become-and so surely have lines drawn on the basis of race been found to generate inequality[25]-that it is very often unnecessary to articulate the reasons why forced segregation is constitutionally impermissible. One must keep clearly in mind, however, that equality under the law is the basic right and that injunctions against forced segregation by race are a remedy for violation of that right.[26]
 Thus in order to show that burdens on the pursuit of an integrated education are a violation of the Constitution, the party making that contention must be able to show that such burdens are a hindrance to his pursuit of the equality guaranteed him by the Constitution. Necessarily, then, one must face the question of the kind of equality required by the Constitution. The answer seems plain, for the Fourteenth Amendment, and for present purposes, the Fifth[27] speaks in terms of a state's denial of equal protection to anyone within its jurisdiction. To the extent, then, that a State (here the District of Columbia) provides public education, it is under a duty to do so in even-handed fashion for all who desire to participate in the programs it offers. But the relevant unit of equality, as it were, is, at least in the context of public education, no larger than the State (here the District of Columbia) and no case we have found has ever suggested that concepts of equal protection require one state to provide educational opportunities equivalent to those provided by another.[28] The correlative of this proposition is, of course, that an individual who desires to participate in a given educational program has a right to participate in programs equal only to those afforded others by the same system (here the District system).
 At most, then-and read, as it must be, in light of Hobson v. Hansen[29]-the effect of Section 401(2) is this: The District will provide an educational system in which each student is given educational opportunities precisely equal to those given to every other student in the system.[30] It will not provide any students, with two exceptions, with educational opportunities necessarily equal to those which can be found in a school system other than its own. Because of the racial composition of the District, the result of the foregoing is inevitably to place burdens on efforts to seek integrated education.[31] Nevertheless, since the constitutional unit of equality here is the District itself, we cannot say that the imposition of such burdens raises a substantial claim of a constitutional violation when the education of District children (with two exceptions) is restricted to the District of Columbia.
 Appellants' second argument concerning the effect of Section 401(2) deals with the two exceptions Congress placed in that Section. By virtue of these exceptions, two groups are furnished an extra-territorial education at the expense of the District of Columbia: (1) handicapped children for whom educational facilities are not available in the District and (2) those children in the District's care and custody (foster children) who already reside in foster homes outside the District.[32] Because extra-territorial education is provided for these two classes, but not for the class which seeks racial integration, appellants argue that the latter are denied equal protection of the laws.
 Once again, we note that there are no claims that there is any racial discrimination in the operation of either of these two programs, either on the face of the statute or in effect. Nor, again, is there any allegation that the classes of exempted persons are shams. Thus, neither of these exceptions discriminates against children of any race. Finally, there is no allegation that the exempted classes receive better-as opposed to simply extra-territorial-education than do members of the non-exempted class. Again, appellants place primary reliance on the proposition that by exempting the above two classes from the operation of Section 401(2) but not those who seek racial integration, special burdens have been placed on the latter and those burdens are unconstitutional.
 It is generally true, of course, that although the District is not obliged to provide any students with an extraterritorial education, it must do so for all equally if it chooses to do so for any.[33] Under the circumstances of this case, however, the District does so equally within the meaning of the Constitution if it has a rational basis for distinguishing between those whom it educates outside the District and those whom it does not.
 We say "rational basis" with calculation, for again it is important to note precisely what claims are before us. In a normal case, when a state makes distinctions based on race, it must have a compelling reason for so doing if the distinction is to be valid. Indeed, the reasons must be so compelling that few can be found.[34] Thus, normally when a member of a minority seeks access to integrated facilities only the most compelling of reasons permit the state to keep him out. As has been said, this result necessarily follows from the proposition that, in a normal case, distinctions based on race provide an inherently unequal application of the laws. In this case, the relevant constitutional unit of equality is no larger than the District of Columbia and appellants have a constitutional right only to an education equivalent to that received by others whom the District educates. Moreover, they have not alleged that the education they are receiving is not the same as is furnished to all races or is not equal to that being received by all others in the District. In seeking a more fully integrated education in the State of Maryland, therefore, appellants cannot do so in the role of those seeking a remedy for enforced inequality but must do so in the role of those seeking better educational benefits than those available in the District. In this role, they stand on the same footing as those who, for example, might request the District to provide funds to enable them to take part in any other specialized educational programs available in Maryland but not in the District.
 Although we recognize the crucial role played by education in our complex society, we think it clear that the decision of the District to support one extra-territorial education program does not mean that only the most compelling of reasons can justify a refusal to support all. Instead, we conclude that where a rational basis is found for a decision to support one program and not another that finding is sufficient to insulate the decision from further judicial scrutiny.[35]
 We find a clear basis for distinguishing between the programs for handicapped and foster children and all others. There are in the District no facilities for properly educating the handicapped whom Section 401(2) exempts and the District's foster children who live in foster homes outside the District. The Congress could rationally decide that, while the costs of education generally were such as to prohibit expenditure of funds for special educational programs, the special situation in which these two classes of children found themselves warranted the expenditure of funds necessary to provide properly for their education.[36] It could also have concluded that desirable as it might be to underwrite other programs, it simply was not financially possible to do so.[37] We cannot say that such legislative conclusions would be irrational. We thus conclude that appellants' attack on Section 401(2) does not present a substantial constitutional question.
 If this opinion seems overly long for one in which a conclusion is reached that appellants' contentions are clearly without merit, we note that its length is due to the complexity of the principles which must govern disposition of the case. Those principles are clear, and extended discussion is required only to show that they govern a very narrow area. State-imposed racial classifications, and state-imposed burdens on the attainment of constitutional rights, remain inherently suspect, if not inherently illegal. But the relevant frame of reference in the field of public education in District of Columbia is no larger than the District itself and it is on that frame of reference on which the District appellants must focus in pursuit of the equality which is rightfully theirs.
 We find no racial discrimination in the congressional law which limits the extra-territorial education of children in the District of Columbia to foster children who are already outside the District and to those handicapped children for whom educational facilities do not exist in the public school system of the District of Columbia. In other words, there is just no support in law or logic to the contention that because Congress authorizes the District of Columbia to educate some handicapped and foster children outside the District that Congress is required to go further and authorize a program of general or limited racial integration between schools of the District and the schools of adjacent states.
 Affirmed.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting:
 Save only for a few, a racially integrated education is unrealizable within the District's almost all-black public school population. For all of the remaining 143,000 children, that opportunity will come, if at all, just to the degree that they are able to share educational experiences with children residing in the District's overwhelmingly white suburbs. There is every indication that this melancholy condition will intensify with the march of time. The case at bar dramatizes both the bleakness of the situation and the frustration of hope for cooperative enterprise in addressing it.
 A congressional ban on expenditure of the District's appropriated funds for education in suburban elementary and secondary schools effectively precludes more than a modicum of joint activity toward any ameliorative endeavor.[1] Not surprisingly, then, the intercommunity Bannockburn Plan has represented the first and only step in that direction.[2] Today my colleagues sound the death knell for all similar arrangements by holding that appellants' challenge to the legislative barrier is unworthy of judicial consideration.
 To this holding I cannot agree. In my view, appellants have raised substantial and serious constitutional issues statutorily entitled to their day in a three-judge district court.[3] Accordingly, I respectfully dissent from the opinion and judgment of the court.
 
 
 *
 The basic facts are undisputed. Appellants are parents of children who were actual or potential participants in the Bannockburn program[4] That project, organized in 1968 and conducted until recently,[5] promised a measure of integrated education to District and Montgomery County children alike.[6] In operation, it made possible the voluntary attendance of a small group of randomly-selected black children at Montgomery County's nearly all-white Bannockburn Elementary School instead of at the District's nearly all-black Meyer Elementary School.[7] All expenses of the program, mainly for tuition and transportation, were borne by the District's Board of Education.[8]
 The Bannockburn Plan faced extinction from its origination. The District of Columbia Revenue Act of 1968,[9] in Section 401(2), laid a new-and, unless repealed or invalidated, a permanent[10]-prohibition on the Board of Education:
 No funds appropriated for the government of the District of Columbia may be used-
 
 
 ******
 
 * * *
 (2) for the cost of education (including the cost of transportation) of any individual in an elementary or secondary school located outside the District of Columbia, except (A) any handicapped individual for whom education facilities do not exist in the public school system of the District of Columbia and (B) any individual under the care, custody, or guardianship of the District of Columbia placed in a foster home or in an institution located outside the District of Columbia.[11]
 Nonetheless, the Bannockburn program survived for three years on the Board's Federal Impact Aid funds[12] and, it seems, private foundation money. During the current school year, the Board terminated the program for reasons unrelated to the statutory interdiction.[13]
 Well prior to the project's demise, appellants filed complaints[14] in the District Court in an effort to lift the Section 401(2) embargo. They alleged that the total proscription on expenditures from appropriated funds for out-of-District education of any but unaccommodated handicapped and nonresident foster children worked a discrimination violating the Due Process Clause of the Fifth Amendment.[15] The complaints emphasized the enormous impediment interposed to plans of the Bannockburn type to overcome racial exclusivity in District public schools. They sought specifically a judgment declaratory of the constitutional invalidity of Section 401(2) and an injunction against its continued operation. From the nature of this redress and the basis advanced therefor, the problem now before us arose.
 An injunction restraining, for federal unconstitutionality, the enforcement or operation of a federal statute is available federally only if the application therefor is heard and determined by a specially composed district court of three judges.[16] The principal inquiry respecting need for a court so constituted is whether the demand for injunctive relief presents a question substantially implicating the Constitution.[17] Appellants' bid for an injunction against Section 401(2) on due process grounds unavoidably invited interception by these requirements,[18] so they requested convention of a three-judge court. The District Judge denied the request and dismissed the complaints for the asserted reason that the questions raised were "so insubstantial that it should not recommend the empaneling of a three-judge court to determine the constitutionality of" the section.
 The problem thus presented here, as to the District Judge, is narrow. It is, not whether appellants should ultimately prevail on the merits of their constitutional claim,[19] but whether the constitutional questions that claim harbors are substantial. And a constitutional question is substantial unless either it is "obviously without merit, or . . . 'its unsoundness so clearly results from . . . previous decisions . . . as to foreclose the subject and leave no room for the inference that the question[] sought to be raised can be the subject of controversy."'[20] I think the issue inexorably generated by appellants' complaints plainly satisfy that test, and accordingly that the District Judge's action was erroneous.
 II
 Any assessment of substantiality of the constitutional questions posed in this case must accept as its background the District's atypical situation vis-a-vis its programs of public elementary and secondary education. The District is an anomolous entity, both geographically and politically. It is a small federal enclave in the midst of two states. The overflow of its constantly expanding population must seek living space in its environs in neighboring counties. As the more affluent have migrated and those beset by economic and social barriers have stayed, its citizenry has become increasingly nonwhite. Today, enrollment in District public schools is more than 97 percent black.[21]
 Although sometimes equated with a municipality,[22] the District lacks the political and economic power ordinarily possessed by municipalities. It has all the problems of any sizable metropolitan area, but has not the internal authority or resources which cities usually can muster in efforts to solve their difficulties. Without home rule[23] or a broad array of revenue sources, the District must rely heavily on federal funding to provide essential community services to its citizens.[24] Not the least of this dependence is for public education, which annually requires an enormous federal appropriation.[25]
 The District's uniqueness as an educational unit accentuates the residual problems of the long era of racial separation in its public schools. More than seventeen years ago the Supreme Court, in Brown v. Board of Education,[26] held that state-imposed racial segregation in public education violates the Equal Protection Clause of the Fourteenth Amendment. Concomitantly, in Bolling v. Sharpe,[27] the Court ruled that enforced segregation in the District's public schools infringes the Due Process Clause of the Fifth Amendment. The Court has since emphasized that school authorities are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."[28] Even now it remains for the Board of Education to fulfill that constitutional mandate.
 In Hobson v. Hansen,[29] the District Court made a thorough study of educational equality in elementary and secondary schools, and uncovered policies and practices that were both segregatory[30] and discriminatory.[31] Race, the court found, played a significant role in the educational offering,[32] and unequal opportunities being provided.[33] If the system continued as it was, the court further found, it would reinforce and perpetuate a multitude of disadvantages,[34] foremost among which was this:
 Negro schools provide their Negro students with an education inferior to that which others, white and Negro alike, receive in integrated or predominantly white education settings. . . . [T]he damage . . . stems from the sense of confinement [segregation] imparts, together with the low esteem which the predominantly Negro school naturally draws from the white as well as Negro community.
 In addition, segregation in the schools precludes the kind of social encounter between Negroes and whites which is an indispensable attribute of education for mature citizenship in an international and democratic society.[35]
 On findings like these, the District Court directed the District's Board of Education to make certain immediate changes,[36] and to undertake the preparation of an all-encompassing integration plan which, significantly for this case, would include efforts to metropolitanize the public school system.[37] In 1967, when the findings were made, there was "no evidence" to which the court could point "that the school administration [had] devoted more than very minor efforts to [promote plans involving] surrounding suburbs."[38] That was the case notwithstanding that "not more than a minority of Washington's Negroes [could] be afforded access to integrated education within the present constraints of the District's schools."[39] The need for metropolitanism arose from the consideration that even if all facilities, faculties and students within the District were fully desegregated, the fact would still remain that, with a 97 percent black school-age population,[40] the vast majority of District children would never have access to integrated educational experiences unless cooperative programs with suburban school boards were undertaken and developed. And, as the District Court pointed out, "the Board of Education seems to have everything to gain . . . and nothing to lose in seeking to initiate negotiations."[41]
 Confessedly, any solution to the District's dilemma respecting racially integrated public education will be hard to come by. The complexity of the problem, however, does not relieve the Board of Education of its constitutional responsibilities.[42] Nor does it relieve Congress of its duty to hew to the Constitution in any action it might decide to take in the matter.
 III
 Viewed against this backdrop, the constitutional questions developed by appellants' complaints are, I submit, truly substantial. That conclusion I draw primarily on the basis of three cases invalidating lawmaking of a character not essentially dissimilar from that decried in the case at bar. As two are decisions of the Supreme Court,[43] and the third the decision of a three-judge district court affirmed by the Supreme Court,[44] their authority as precedents cannot be doubted. Close analysis of these decisions, I believe, refines the legal principles which are decisive here, and pinpoints the standards by which substantiality is properly to be measured.
 In the first case, Reitman v. Mulkey,[45] the Supreme Court examined the validity, under the Equal Protection Clause,[46] of a California constitutional amendment prohibiting the state from denying to any person the right to sell or rent his real estate as he chose. The Court sustained the holding of the Supreme Court of California that the amendment, on examination of its "constitutionality . . . in terms of its 'immediate objective,' its 'ultimate effect' and its 'historical context and conditions existing prior to its enactment,"'[47] "encourage[d] and significantly involve[d] the State in private racial discrimination contrary to the Fourteenth Amendment":[48]
 Here the California court, armed as it was with the knowledge of the facts and circumstances concerning the passage and potential impact of [the amendment], and familiar with the milieu in which that provision would operate, has determined that the provision would involve the State in private racial discriminations to an unconstitutional degree. We accept this holding of the California court.[49]
 Emphasizing "the necessity for a court to assess the potential impact of official action in determining whether the State has significantly involved itself with invidious discriminations,"[50] the vice in the amendment was laid bare:
 [The amendment] was intended to authorize, and does authorize, racial discrimination in the housing market. The right to discriminate is now one of the basic policies of the State. The California Supreme Court believes that the section will significantly encourage and involve the State in private discriminations. We have been presented with no persuasive considerations indicating that this judgment should be overturned.[51]
 Under review in the second case, Hunter v. Erickson,[52] was an amendment of the charter of the City of Akron, Ohio, requiring any ordinance regulating racial, religious or ancestral discrimination in housing to be approved by a majority of the electorate. Future as well as existing fair housing ordinances were affected by the charter change.[53] The Court held that the amendment created "an explicitly racial classification treating racial housing matters differently from other racial and housing matters":[54]
 [The amendment] drew a distinction between those groups [seeking] the law's protection against racial, religious, or ancestral discriminations in the sale and rental of real estate and those who sought to regulate real property transactions in the pursuit of other ends. Those who sought, or would benefit from, most ordinances regulating the real property market remained subject to the general rule. . . . Passage by the [City] Council sufficed unless the electors themselves invoked the general referendum provisions of the city charter. But for those who sought protection against racial bias, the approval of the City Council was not enough. A referendum was required by charter at a general or regular election, without any provision for use of the expedited special election ordinarily available. The Akron charter obviously made it substantially more difficult to secure enactment of ordinances subject to [the amendment].[55]
 The third case, Lee v. Nyquist,[56] treated constitutional claims strikingly similar to those presented here. The importance of this decision derives both from the court's consideration of the implications of Reitman in such a context and from the court's application of Hunter as the controlling precedent. Parents of school-age children in Buffalo, New York, challenged the constitutionality of a statute which, with exceptions not material, prohibited the assignment of students, and the establishment or maintenance of school units, for the purpose of achieving racial parity in attendance, except with parental consent or approval of a local board of education having a majority of elected members. State school officials, appointed school boards and boards lacking a majority of elected members were intercepted by the statutory proscription. The court found that the statute impeded efforts calculated to curtial racial isolation in the public schools. It held that the statute thus discriminated against endeavors to reduce racial imbalance, and thereby violated the Equal Protection Clause.
 
 
 A
 fuller understanding of the decision in Lee accompanies a deeper probe into its factual and legal underpinnings. In the court's view, there was "a good case for the applicability of the principle of Reitman v. Mulkey"[57] since "[e]xamination of the 'historical context,' the 'immediate objective,' and the 'ultimate effect' of [the statute] supports the proposition that the statute serves to continue segregation in the schools and thus 'significantly encourage[s] and involve[s] the State' in racial discrimination."[58] Prior to the statute's passage, the state board of education, the Regents of the University of the State of New York,[59] supported an antisegregation policy in the public schools against considerable local resistance, and appointed school officials engaged actively in executing plans to improve racial balance therein.[60] The court's analysis of the statute's legislative history disclosed that it was designed to cripple efforts of that kind.[61] Answers to interrogatories propounded to the Commissioner of Education supported the court's finding that the ultimate effect of the legislation would be hindrance of activities seeking a greater measure of racial integration in the schools.[62]
 Nonetheless, the court found it unnecessary to rest its decision on Reitman. Concluding that the statute created an "explicitly racial classification,"[63] the court took Hunter v. Erickson[64] for its decisional base:[65]
 The principle of Hunter is that the statute creates an "explicitly racial classification" whenever it differentiates between the treatment of problems involving racial matters and that afforded other problems in the same area.
 This is the effect of [the statute]. . . . [B]y prohibiting the implementation of plans designed to alleviate racial imbalance in the schools except with the approval of a local elected board or upon parental consent, [the statute] creates a single exception to the broad supervisory powers the state Commissioner of Education exercises over local public education [citation omitted]. With regard to all other matters affecting educational policy, the Commissioner has the authority to order local boards to act in accordance with state educational policies as formulated by the Board of Regents. Parties considering themselves aggrieved by local board actions may seek to have the Commissioner enforce those policies [citation omitted]. [The statute], however, singles out for different treatment all plans which have as their purpose the assignment of students in order to alleviate racial imbalance. The Commissioner and local appointed officials are prohibited from acting in these matters only where racial criteria are involved. The statute thus creates a clearly racial classification, treating educational matters involving racial criteria differently from other educational matters and making it more difficult to deal with racial imbalance in the public schools. We can conceive of no more compelling case for the application of the Hunter principle.[66]
 As the court concluded, "[i]n the final analysis the statute fails in justification because it structures the internal governmental process in a manner not founded on neutral principles."[67] Rather, "[t]he New York Legislature has acted to make it more difficult for racial minorities to achieve goals that are in their interest."[68] In consequence, "[t]he statute . . . operates to disadvantage a minority, a racial minority, in the political process"[69] and that, the court held, "constitutes an explicit and invidious racial classification and denies equal protection of the law."[70]
 These three cases-Reitman,[71] Hunter[72] and Lee[73]-identify the strands of constitutional doctrine which impart strength to the claims our appellants assert. The Equal Protection Clause forbids action which "involve[s]"[74] or "significantly encourage[s]"[75] a state in racial discrimination;[76] it outlaws any state action which produces an "explicitly racial classification"[77] increasing the difficulty of dealing with uniquely racial problems.[78] Legislation achieves a constitutionally condemned result if it unjustifiably distinguishes between the treatment of such problems and others in the same area.[79] And what the Equal Protection Clause of the Fourteenth Amendment moves beyond the reach of states in the area of public school segregation and discrimination the Due Process Clause of the Fifth denies to the Federal Government.[80] Measured by these governing criteria, appellants' constitutional contentions are substantial enough to require consideration and resolution by a three-judge district court, a matter to which I now turn.
 IV
 Lest we forget, the statute in suit resides within the area where the exactions of the Constitution are among the highest. "Distinctions between citizens solely because of their ancestry are by their very nature odius to a free people whose institutions are founded upon the doctrine of equality."[81] "[A]ll legal restrictions which curtail the civil rights of a single racial group are immediately suspect,"[82] and "courts must subject them to the most rigid scrutiny."[83] By the same token, "[c]lassifications based solely upon race must be scrutinized with particular care, since they are contrary to our traditions and hence constitutionally suspect."[84] Such classifications, "in most circumstances irrelevant,"[85] are never validated simply because they may conceivably or even rationally be related to permissible governmental goals, but only if "a heavy burden of justification"[86] is discharged.[87] The goals "must be unattainable by narrower or less offensive legislative courses; and even so, those objectives must be of sufficient magnitude to override" the resulting inequities.[88] Particularly in light of these considerations, the issues appellants raise seem plainly substantial.
 The first question arising on appellants' presentation is whether, under the doctrine of Reitman v. Mulkey,[89] Section 401(2) "encourage[s]" or "significantly involve[s]" the Federal Government "in . . . racial discrimination."[90] That inquiry would render appropriate a careful investigation into the section's "historical context," its "immediate objective" and its "ultimate effect,"[91] and such an exploration appears certain to bear fruit. Access to integrated education in District schools has remained, even after Hobson v. Hansen,[92] a very limited possibility. The District Board of Education, mindful of the array of problems indigenous to the District.[93] joined hands with Montgomery County school authorities. The Bannockburn Plan, akin to programs already existent in other metropolitan areas,[94] emerged from their efforts, and a small start toward intercommunity cooperation has been made. Immediately, however, that plan and all others which would foster redistribution of District school children, came under a congressional cloud of impending doom.
 Five days after the Bannockburn project was publicly announced, the House District of Columbia Committee, citing a policy of fiscal economy[95] and a feeling that racial balancing in schools is an extravagance,[96] inserted two new provisions in the pending District of Columbia Revenue Act of 1968.[97] The first, Section 401(1), specified that
 No funds appropriated for the government of the District of Columbia may be used-
 (1) to provide transportation for students enrolled in the public schools of the District of Columbia if the transportation is provided solely to change the racial balance in any public school in the District of Columbia.[98]
 The second provision inserted was the present Section 401(2) without the exemption for out-of-District foster children. As to the provision in that form, the Committee had this to say:
 Your Committee is advised that a plan is being promoted to send some children from the District to a public school or schools in suburban Maryland, with the District Government paying the tuition and other expenses involved.
 Again, this appears to your Committee to be a flagrant and totally unnecessary dissipation of public funds. The expenditures for public education in the Nation's capital are fully adequate to provide good educational facilities in the city for all its children, and there appears no need whatever to pay to send any D. C. pupils into suburban schools.[99]
 When the House proposals reached the Senate, that body demurred. Its Committee on the District of Columbia felt that they "involve[d] certain questions of policy which the committee believe[d] [were] matters best left to the localities, in this case the District of Columbia government to decide."[100] The Committee also called attention to the fact that the Section 401(2) proposal, as it then stood, would cut off funds for the education of foster children placed in homes outside the District.[101] The Senate passed version of the Revenue Act accordingly omitted Section 401 in its entirety. The Conference Committee, however, amended the section to its present form-by inclusion of the exemption for foster children-and reinserted it in the bill.[102] Both Houses concurred in the bill as so amended.
 As in Reitman,[103] where California discarded its neutrality toward housing racism by affirmatively authorizing private discrimination in land sales and leases, so also in this instance Congress may have abandoned a neutral stance toward the racial problem in District schools by prohibiting the funding of ameliorative projects from appropriated monies. Beyond cavel, Section 401(1)'s ban on the use of appropriated funds for the expense of local transportation incidental to pupil redistribution essential to reduction of the gross racial imbalance found in District public schools[104] was an unconstitutional interference with judicial directives to desegregate these schools and plans implementing those directives.[105] And Section 401(2)'s outright denial of appropriated funds to the Bannockburn project and others like it may have been a shift from dead center to active congressional opposition to racial balancing on an intercommunity basis, and so to a position in the teeth of Reitman.[106]
 It may also be that Section 401(2) erected an "explicitly racial classification"[107] within Hunter's condemnation[108] by enjoining expenditures of appropriated funds for any extraterritorial schooling of any but some of the District's handicapped and foster children. It cannot be gainsaid that the legislation not only placed substantial burdens on continuation of the small-scale Bannockburn program but also well nigh insurmountable barriers in the way of any efforts-small or large-to alleviate the racial oneness preponderating District schools by programs affording District children opportunities for attendance at suburban schools. The constitutional specter thus faced is a clearly racial classification, prescribing a different treatment for racial isolation in District schools than for other educational and even for other racial problems.
 My colleagues seek refuge in the argument that Congress has no constitutional responsibility toward the near racial singleness in the District's public schools, and for that reason is free to restrict out-of-District education as it will.[109] I need not address the validity of their legal premise for in any event the argument is beside the point. In Lee v. Nyquist,[110] it was urged that the legislation under challenge "does not constitute impermissible state involvement in racial discrimination, since in the absence of de jure segregation, the state is under no obligation to take affirmative action to reduce de facto segregation in the public schools and thus does not discriminate when it leaves such matters to a local elected board, so long as freedom of choice is preserved."[111] That contention the court set for naught:
 [T]he argument that the state has not discriminated because it has no constitutional obligation to end defacto racial imbalance fails to meet the issue under Hunter v. Erickson.[112] The statute places burdens on the implementation of educational policies designed to deal with race on the local level. Indeed it completely prohibits the implementation of such policies where the local board is not elected. The discrimination is clearly based on race alone, and the distinction created in the political process, based on racial considerations, operates in practice as a racial classification.[113]
 True it is that a collision of Section 401(2) with egalitarian doctrine would not necessarily be fatal, for there would remain the question whether the classification it erects can be suitably justified. But the "heavy burden of justification"[114] would require a showing that the classification was "necessary, and not merely rationally related to the accomplishment of a permissible [governmental] policy."[115] It would also require a demonstration that the legislative goal is "unattainable by narrower or less offensive legislative courses"[116]-"by alternative methods, not involving racial distinctions"[117]-"and even so" a showing that "those objectives [are] of sufficient magnitude to override" the evident discrimination.[118] And the query as to whether these standards have been satisfied is itself a substantial constitutional question.
 The only justification for Section 401(2) specified by Congress, and the only one suggested by appellees, is that it would cut the spiraling cost of operating the District's public school system.[119] To be sure, the House report detailed the soaring expense of public education in the District and stressed a need for curtailing expenditures on some programs in order to retard the trend upward.[120] Certainly the desire of Congress to conserve the public fisc is to be commended, but judicial inquiry into the constitutionality of the techniques employed for the purpose cannot stop at that point. The prohibitions of the Due Process Clause of the Fifth Amendment extend to all conceivable forms of federal action,[121] not the least of which is action of the Federal Legislature.[122] No less in trimming outlays for public programs is Congress subject to due process mandates, with their built-in requirement of equality,[123] than in any other of its other law-making endeavors.[124] Already it seems apparent from the record that Section 401(2) is open to serious problems.
 In 1968, when the section was enacted, three programs existed for education of children outside the geographical boundaries of the District. One of those, Bannockburn, had been publicly announced only five days before the prohibitions the section was to incorporate were proposed.[125] The other two-for handicapped children whom District schools cannot accommodate and foster children who reside in the states-were specifically exempted from those prohibitions.[126] Only Bannockburn and similar programs envisioning racially balanced education were affected by the legislation. Likewise in 1968, the cost of educating District children outside the District was approximately $2,000 per pupil.[127] This was about $74 less than the per-pupil expense of elementary education in the District school with the highest per-pupil expenditure.[128] The legislative record contains no finding that the outlay for that school was excessive, but only that for the Bannockburn project.[129] Yet as late as 1971 that project required only $58,800[130] of the more than $150 million the Congress appropriates for public education annually.[131]
 
 
 A
 legislative desire to economize by reducing appropriations cannot validate otherwise impermissible legislation[132] Standing alone, it cannot excuse a failure to utilize nonracial alternatives to the destruction of programs fostering racial equality,[133] and any suggestion that such alternatives were not available would border on the incredible. A ready example is a more general per-pupil cutback in the District's education budget;[134] undoubtedly there were a good many others that would have achieved the desired economy in a completely even-handed fashion and in a mode acceptable to the Constitution. Instead, Congress legislated to deny appropriated funds for the single ongoing program promoting extraterritorial integration and any other similar programs following in its footsteps, and thereby reduced drastically-perhaps fatally-the alternatives available to the Board of Education in the troubled area of racial isolation in District schools.
 The heavy impact of today's decision will be felt, not alone by appellants and their children, but by the populace of the District, present and future, as a whole, and in the end by the Nation itself. "[E]ducation," no less now than in 1954, "is perhaps the most important function of state and local governments."[135] 5] New documentation is hardly needed to confirm the accepted tenet that "the elimination of racial isolation in the schools promotes the attainment of equal educational opportunity and is beneficial to all students, both black and white."[136] Educational isolation exerts its debilitating force without, as well as with, governmental sanction,[137] and exacts its toll from racial majorities as well as racial minorities.[138] That isolation is perpetuated by Section 401(2), the validity of which, the court now holds, cannot be put to the test.
 Truly it has been said that "[i]n this day and time of dynamic expansion of constitutional principles and their application to new and sometimes unheard of situations it takes judicial prescience of a Delphic order to say with certainty that [an] attack is insubstantial."[139] I would be hard put to relate that observation more aptly than to the question whether Section 401(2) can survive appellants' constitutional objections. A negative answer to the question is not foreclosed by precedent nor, by my appraisal, is the question "obviously without merit."[140] It is, I think, substantial and grave, and deserves more than the dubious answer my colleagues suggest. It summons, I believe, a full judicial examination on the merits-by a three-judge district court.
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.
 ON MOTION FOR REHEARING EN BANC
 PER CURIAM.
 These causes came on for rehearing by the Court sitting en banc, and the Court heard argument of counsel.
 The Court is equally divided as to whether the judgment of the District Court should be affirmed. The order of March 7, 1972 granting rehearing en banc, did not vacate the judgment of the division entered January 19, 1972, and the opinions filed that date. Any action of the Court en banc can neither affect the judgment of affirmance, nor provide an authoritative exposition of pertinent legal doctrine. Accordingly, it is
 Ordered by the Court en banc that the order of March 7, 1972 granting rehearing en banc is hereby vacated, and the judgment of affirmance entered January 19, 1972, by the division remains in effect.
 
 
 J
 SKELLY WRIGHT, Circuit Judge, did not participate in the foregoing order
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 292(c) (1970)
 
 
 [1]
 Pub.L.No. 90-450, Sec. 401(2), 82 Stat. 615, D.C.Code Sec. 31-1118(2) (Supp. IV 1971)
 
 
 [2]
 28 U.S.C. Sec. 2282 (1970). A recent discussion of three-judge court litigation and pending proposals for reform is contained in Ammerman, Three-Judge Courts: See How They Run, 52 F.R.D. 293 (1971). For a brief discussion of three-judge courts in segregation cases, see Alabama State Teachers Ass'n v. Alabama Public School & College Auth., 393 U.S. 400, 401-403, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969) (Harlan, J., dissenting)
 
 
 [3]
 The trial court dismissed the complaint on the grounds that it failed to state a claim on which relief could be granted and that the action was not "ripe." Presumably, the court felt that the case was not ripe because Section 401(2) had not yet caused any injury. See note 8, infra. While we do not agree with the court's conclusions concerning ripeness, we see no need for discussion of the matter since we do agree with the alternative conclusion that no claim is presented on which relief can be granted. See Bradshaw v. United States, 143 U.S.App.D.C. 344, 356, 443 F.2d 759, 771 (1971)
 
 
 [4]
 Jenkins v. McKeithen, 395 U.S. 411, 421-422, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); United States v. New Wrinkle, Inc., 342 U.S. 371, 376, 72 S.Ct. 350, 96 L.Ed. 417 (1952). See generally 2A J. Moore, Federal Practice p 12.08 (1968)
 
 
 [5]
 The Plan operates in only one direction. It provides for District children to be educated in Maryland but no Maryland children are to be educated in the District. In this and other respects, the Plan is allegedly similar to others currently in operation throughout the country, among them METCO (Boston) and Project Concern (Hartford and New Haven), except that here the plan seeks to embrace a foreign state
 
 
 [6]
 Among the costs which the District agreed to pay were apparently included those for tuition and transportation. 115 Cong.Rec. 23139 (1969) (Remarks of Rep. Fuqua)
 
 
 [7]
 114 Cong.Rec. 24706, 24761 (1968)
 
 
 [8]
 Since all money in the District's regular school budget comes from appropriated funds, see generally Bradshaw v. United States, 143 U.S.App.D.C. 344, 350, n. 13, 443 F.2d 759, 765 n. 13 (1971), Section 401(2) precludes the District from using any of its regular funds to support the Plan. However, Impact Aid Funds, 20 U.S.C. Sec. 236 et seq. (1970), have been used to implement the Plan to some extent
 
 
 [9]
 The Fourteenth Amendment is not applicable to the District of Columbia. However, concepts of equal protection are inherent in the due process of law guaranteed to citizens of the District by the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Washington v. United States, 130 U.S.App.D.C. 374, 401 F.2d 915 (1968); United Federation of Postal Clerks v. Blount, 325 F.Supp. 879, 883 (D.D.C.1971) (three-judge court); Hobson v. Hansen, 269 F.Supp. 401, 492-493 (D.D.C.1967). In the context of the case before us, we treat the educational rights guaranteed to citizens of a state by the Equal Protection Clause of the Fourteenth Amendment as precisely equivalent to those guaranteed citizens of the District by the Due Process Clause of the Fifth
 
 
 [10]
 We do not believe that this case was rendered moot by the District School Board's termination of the Bannockburn program shortly after the opening of the present school year, while this appeal was sub judice. See Bulluck v. Washington, Nos. 24862-3, 147 U.S.App.D.C. 53, 452 F.2d 1385 (1971) (Motion for Temporary Injunctive Relief). The statute still exists and the proponents of the Bannockburn plan continue to advocate its reinstatement. We thus have before us a concrete factual situation in which appellants have a continuing interest and we need not await a direct violation of the statute before passing upon its validity. Lee v. Nyquist, 318 F.Supp. 710, 713-715 (W.D.N.Y.1970), aff'd, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971); Antonelli v. Hammond, 308 F. Supp. 1329, 1334 (D.Mass.1970). And see Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967)
 
 
 [11]
 We consider no questions other than the substantiality of the constitutional claim although others were briefed by the parties. See, e. g., note 3, supra. One group of plaintiffs consists of Maryland citizens whose children attend Bannockburn School. Had we reached a different result on the underlying merits of the constitutional claim, the standing of the Maryland parents to maintain this action would itself present a question for the three-judge court. See Flast v. Gardner, 267 F.Supp. 351, 352 (S.D.N.Y.), dismissed, 271 F.Supp. 1 (S.D.N.Y.1967) (three-judge court), rev'd sub nom. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)
 
 
 [12]
 They do, however, state that the District is under a compulsion to utilize suburban schools in desegregating its own. Brief for appellants at 18, 22 n. 1, 34. Their belief in this regard stems from the following statement in Hobson v. Hansen, 269 F.Supp. 401, 515-516 (D.D.C.1967), where the court, in ordering the District to prepare a comprehensive school desegregation plan, stated:
 The plan, too, should anticipate the possibility that integration may be accomplished through cooperation with school districts in the metropolitan suburbs.
 A claim that this statement amounts to an order to utilize the suburbs in desegregating the District's schools and that the District is not complying with that order should, of course, be directed in the first instance to the court which issued the order. Consequently, the question of whether the district is under such a compulsion plays no further role in our discussion of this case.
 
 
 [13]
 D.C. Revenue Act of 1968, Pub.L.No. 90-450. Sec. 401(1), 82 Stat. 615, D.C. Code Sec. 31-1118(1) (Supp. IV 1971) provides:
 No funds appropriated for the government of the District of Columbia may be used-
 (1) to provide transportation for students enrolled in the public schools of the District of Columbia if the transportation is provided solely to change the racial balance in any public school in the District of Columbia. . . .
 A similar provision first appeared in the D.C. Revenue Act of 1967, Pub.L.No. 90-135, Sec. 16, 81 Stat. 441.
 
 
 [14]
 H.R.Rep.No. 1609, 90th Cong., 2d Sess. 5 (1968). The Senate thought that whether sums should be expended by the District in support of the Plan was a matter for the local officials to decide. 114 Cong.Rec. 23517 (1968)
 
 
 [15]
 See, e. g., Palmer v. Thompson, 403 U.S. 217, 234-236, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) (Douglas, J., dissenting); Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L. Rev. 526, 538-44 (1947). Sometimes, however, the two are confused. E. g., Note, Symbolic Conduct, 68 Colum.L.Rev. 1091, 1123 n. 175 (1968)
 
 
 [16]
 New York State v. Roberts, 171 U.S. 658, 681, 19 S.Ct. 70, 43 L.Ed. 323 (1898) (Harlan, J., dissenting); accord, Palmer v. Thompson, supra note 15, 403 U.S. at 224-226, 91 S.Ct. 1940. Indeed, in United States v. O'Brien, 391 U.S. 367, 383, 384-385, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Court equated "purpose," as used by O'Brien, and "motive," and then said that both were irrelevant to the statute's constitutionality. What was relevant was the inevitable effect of the statute. Analysis of constitutional problems in terms of O'Brien does much to remove the difficulty which beclouds the area
 
 
 [17]
 In narrow classes of cases, "purposes" may be said to be relevant to a statute's validity. One example was mentioned by the Court in O'Brien, supra, 391 U.S. at 383 n. 30, 88 S.Ct. 1673, 20 L.Ed.2d 672. One other example also might be noted. If by first looking to the effect of a statute, a court finds that a burden is placed on the exercises of a protected right, it may then look to state interests advanced by the statute to determine whether they are sufficient to permit imposition of the burden. See, e. g., Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); cf. Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). To the extent that the "interests" advanced by the statute are equated with the "purposes" for its enactment, the latter may become relevant
 
 
 [18]
 Even such legislative history as does exist is not entirely convincing on the question of the existence or nonexistence of the statute's racial purposes. The provision that was to become Section 401 (2) first appeared as a committee amendment to the District's pending revenue bill. 114 Cong.Rec. 19439 (1968). Its insertion was triggered by the Bannockburn Plan. H.R.Rep.No. 1609, 90th Cong., 2d Sess. (1968). One legislator, Rep. Broyhill, said that the Plan was an "outrageous misspending of the taxpayer's [sic] money." 114 Cong.Rec. 19974 (1968). Another, Rep. Fraser, moved to strike it out of the revenue bill on the grounds (1) that whether or not to support the Plan financially should be a local matter and (2) that as drafted, the Section would eliminate support for foster children. Id. at 11984. The motion was defeated 64-48, id. 19985, and the provision remained in the bill when it passed the House. Id. at 19986. The Senate deleted the provision for the same reasons urged by Rep. Fraser. S.Rep.No. 1448, 90th Cong., 2d Sess. 18 (1968). After brief debate, the bill as amended passed the Senate without discussion of the deletion of Section 401(2). 114 Cong. Rec. 23519 (1968). The Senate-House Conferees reinserted Section 401(2) after rewriting it to exempt foster children. H.R.Conf.Rep.No. 1829, 90th Cong., 2d Sess. 7-8 (1968). As amended by the Conferees, the bill passed without debate in the House, 114 Cong.Rec. 24761 (1968), and in the Senate, id. at 24706. The following year, a motion was again made to remove the Section from the District's revenue bill. One who voiced opposition to removal was concerned about the cost of the Bannockburn Plan, and another was concerned about the possibility that similar plans might become mandatory. The motion was defeated 83-74. 115 Cong.Rec. 23139-40 (1969). In light of this history, a contention that the dominant "motive" behind Section 401(2) was a racial one hangs by slender threads
 
 
 [19]
 Other than through its use of Impact Aid funds. See note 8, supra
 
 
 [20]
 Compare, e. g., Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)
 
 
 [21]
 Compare, e. g., Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L. Ed.2d 256 (1964); Meredith v. Fair, 298 F.2d 696 (5th Cir.), cert. denied, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66 (1962)
 
 
 [22]
 347 U.S. at 494, 74 S.Ct. at 691
 
 
 [23]
 Id. The Court also approved a finding of the lower court that segregation without the force of law had a detrimental effect on black children. Id. See generally note 25, infra
 
 
 [24]
 Id. at 495, 74 S.Ct. at 692 (emphasis added)
 
 
 [25]
 Indeed, "where it is possible to identify a white school or a 'Negro' school simply by reference to the racial composition of teachers and staff . . . a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971)
 
 
 [26]
 Winston-Salem/Forsyth County Board of Educ. v. Scott, 404 U.S. 1221, at 1229, 92 S.Ct. 1236, at p. 1241, 31 L.Ed.2d 441 (decided August 11, 1971) (Burger, Circuit Justice); Swann v. Charlotte-Mecklenburg Board of Educ., 402 U.S. 1, 22, 28, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Green v. County School Board, 391 U.S. 430, 437, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)
 
 
 [27]
 See note 9, supra
 
 
 [28]
 Relevant units, of course, may be smaller than statewide. Cf. Rainey v. Board of Educ., 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968). Compare Lee v. Nyquist, 318 F.Supp. 710 (W.D. N.Y.1970) (three-judge court), aff'd, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971). We are dealing in this case, however, with only a single district encompassing the entire District of Columbia. Hobson v. Hansen, 327 F.Supp. 844, 860 n. 27 (D.D.C.1971)
 
 
 [29]
 269 F.Supp. 401 (D.D.C.1967), aff'd sub nom. Smuck v. Hobson, 132 U.S.App. D.C. 372, 408 F.2d 175 (1969, en banc), provided that the District refrain from discriminating between students in its schools on the basis of race or economic status. Hobson v. Hansen, 320 F.Supp. 409 (D.D.C.1970) required that the District reconsider certain lines it had drawn to divide the City into school districts. Hobson v. Hansen, 320 F.Supp. 720 (D. D.C.1970) dealt with a similar problem and enjoined the drawing of certain lines. Hobson v. Hansen, 327 F.Supp. 844 (D. D.C.1971) ordered the equalization of per pupil expenditures in the District's schools
 
 
 [30]
 There is no allegation that the District is unable to comply with the remedial measures mandated by Hobson v. Hansen, supra note 29. Nor is there any allegation that it is unwilling to do so. Whether, in either case, the District could be compelled to expend money to provide such remedies by sending its school children to schools in adjoining states is a question not involved in the case before us. See generally Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938) for some of the considerations which might be applicable to such a case
 
 
 [31]
 Black students comprise some 95% of all students in the District's public school system. Hobson v. Hansen, 327 F.Supp. 844, 861-862 n. 28(3) (D.D.C.1971)
 
 
 [32]
 The precise number of the latter group is not clear. The Senate report which accompanied the original Section 401(2) to the floor stated that there were "hundreds." S.Rep. No. 1448, 90th Cong., 2d Sess. 18 (1968)
 
 
 [33]
 Compare, e. g., Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed. 2d 438 (1971) with Watson v. City of Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963). See generally Griffin v. Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956)
 
 
 [34]
 At least theoretically, however, they do exist. See generally Baker v. City of St. Petersburg, 400 F.2d 294 (5th Cir. 1968); Comment, Race as a Basis for Police Duty Assignments, 49 B.U.L.Rev. 590 (1969)
 
 
 [35]
 See Dandridge v. Williams, 397 U.S. 471, 483-487, 90 S.Ct. 1153, 25 L.Ed. 2d 491 (1970); McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed. 2d 393 (1961); cf. Hobson v. Hansen, 269 F.Supp. 401, 497 (D.D.C.1967)
 
 
 [36]
 Cf. Hobson v. Hansen, 327 F.Supp. 864 (D.D.C.1971)
 
 
 [37]
 We note that one member of the House of Representatives stated that the per pupil expenditure required to finance the Bannockburn Plan was "approximately $1,597," and that this was roughly double the $797 per pupil being expended in the District. 115 Cong.Rec. 23139 (1969). Another member challenged the conclusions to be drawn from this assertion, saying, inter alia, that foundation grants would make the Bannockburn Plan about as costly as providing education in the District. Id. In the court below, it was asserted that the actual cost to the District, see note 8, supra, was about $50,000 or $2,000 per pupil participating in the Bannockburn Plan. We note these assertions simply as additional support for our conclusion that Congress could have rationally determined that the Bannockburn Plan, as well as other extra-territorial plans for educating District students, were simply too expensive to allow
 
 
 [1]
 See text infra at note 11. While, as there set forth, some handicapped and foster children are excepted, it is evident that the many thousands of other District children are, as a practical matter, barred from suburban schools
 
 
 [2]
 Not even the Bannockburn project is in operation now. See note 5, infra
 
 
 [3]
 The task on this appeal is to determine whether appellants' contention should have been entertained on the merits-whether they posed a substantial constitutional question or questions-and not how they should be resolved. See text infra at notes 19-20. Nothing I say in elucidation of my position on the first aspect is to be taken as an intimation of a view on the outcome on the second
 
 
 [4]
 See note 14, infra
 
 
 [5]
 The Plan was approved in 1968 by the school authorities of the District and Montgomery County. It went into effect in September of that year with 21 volunteer participants, and extended with an increase to a slightly larger number over the period of the next three years. The District Board of Education ceased its affiliation, temporarily at least, shortly after the opening of the present academic term, while this appeal was under submission. We denied appellants' motion for a temporary injunction mandating continuance of the program pending disposition of the appeal. Bulluck v. Washington, No. 24,862, 147 U.S.App.D.C. 53, 452 F.2d 1385 (1971). I join with my colleagues in holding, ante p. 1100 n. 10, that the Board's action did not render the case moot
 
 
 [6]
 See note 7, infra
 
 
 [7]
 The record on appeal does not describe the Plan comprehensively. It is my understanding, from such details as can be gleaned, that the Plan contemplated, though it did not actually produce, an exchange of students between the two systems, with County children attending school in the District as well. As thus envisioned, the Plan would have afforded integrated educational experiences in the District as well as in the County. It was primarily because a dual exchange of children was not accomplished that the District Board of Education dissolved its partnership with Montgomery County. See Bulluck v. Washington, supra note 5, at 1099
 
 
 [8]
 Apparently, because no County child ever enrolled in a District school
 
 
 [9]
 82 Stat. 612 (1968)
 
 
 [10]
 Section 401(2) is a general law, and not just a restriction attaching to the one appropriation
 
 
 [11]
 82 Stat. 615 (1968), D.C.Code Sec. 31-1118(2) (Supp. IV 1971)
 
 
 [12]
 See 20 U.S.C. Sec. 236 et seq. (1970). The legal availability, though not the sufficiency, of those funds for the purpose stands unquestioned in this case
 
 
 [13]
 See Bulluck v. Washington, supra note 5
 
 
 [14]
 Appellants in No. 24,862 are parents of children participating or eligible to participate in the Bannockburn program when it ground to a halt. Appellants in No. 24,863 are parents of children then or later to be enrolled at Bannockburn. In all material respects the complaints are similar. The District Judge treated the two actions as one, and the appeals have been consolidated in this court
 
 
 [15]
 Despite differences between the Fifth and Fourteenth Amendments, the Fifth's Due Process Clause reaches racial segregation in public education to essentially the same extent as does the Fourteenth's Equal Protection Clause. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954)
 
 
 [16]
 28 U.S.C. Secs. 2282, 2284 (1964). For expressions on the policies the three-judge requirement subserves, see Moody v. Flowers, 387 U.S. 97, 101-103, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1966); Swift & Co. v. Wickham, 382 U.S. 111, 114-119, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965); Kennedy v. Mendoza-Martinez, 372 U.S. 144, 152-155, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, 318-319, 60 S.Ct. 517, 84 L.Ed. 774 (1940); Cumberland Tel. & Tel. Co. v. Louisville Pub. Serv. Comm'n, 260 U.S. 212, 219, 43 S.Ct. 75, 67 L.Ed. 617 (1922). For general discussions of the requirement, see Ammerman, Three-Judge Courts: See How They Run, 52 F.R.D. 292 (1971); Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1 (1964); Hutcheson, A Case for Three Judges, 47 Harv.L.Rev. 426 (1930); Comment, The Three Judge Federal Court in Constitutional Litigation: A Procedural Anachronism, 27 U.Chi.L.Rev. 555 (1966); Comment, The Three-Judge District Court and Appellate Review, 49 Va.L.Rev. 538 (1963); Comment, 1 Race Rel.L.Rep. 811 (1956)
 
 
 [17]
 Turner v. Fouche, 396 U.S. 346, 353-354, 90 S.Ct. 532, 24 L.Ed.2d 567 n. 10 (1969); King v. Smith, 392 U.S. 309, 312 n. 3, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1967); Swift & Co. v. Wickham, supra note 16, 382 U.S. at 114, 86 S.Ct. 258, 15 L.Ed.2d 194, Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962); Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152 (1933). The District Judge to whom the injunctive application is presented makes that determination initially, and additionally ascertains "whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three-judge statute." Idlewild Bon Voyage Liquor Corp. v. Epstein, supra, 370 U.S. at 715, 82 S.Ct. at 1296. See also Reed Enterprises v. Corcoran, 122 U.S.App.D.C. 387, 390, 354 F.2d 519, 522 (1965). Otherwise, however, the powers of a single judge in three-judge cases are very limited. See 28 U.S.C. Sec. 2284 (1964)
 
 
 [18]
 The statute under attack, though geographically applicable only to the District of Columbia, is legislation as to which the three-judge requirement obtains. Shapiro v. Thompson, 394 U.S. 618, 625, n. 4, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); cf. Jeannette Rankin Brigade v. Chief of Capitol Police, 137 U.S. App.D.C. 155, 158 n. 3, 421 F.2d 1090, 1093 n. 3 (1969); Harrell v. Tobriner, 279 F.Supp. 22, 24 (D.D.C.), aff'd, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)
 
 
 [19]
 Compare Schneider v. Rusk, 372 U.S. 224, 225, 83 S.Ct. 621, 9 L.Ed.2d 695 (1963); Idlewild Bon Voyage Liquor Corp. v. Epstein, supra note 17, 370 U.S. at 715, 82 S.Ct. 1294
 
 
 [20]
 Levering & Guarrigues Co. v. Morin, 289 U.S. 103, 105-106, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933), quoting Hannis Distilling Co. v. Baltimore, 216 U.S. 285, 288, 30 S.Ct. 326, 54 L.Ed. 482 (1909). See also California Water Serv. Comm'n v. Redding, 304 U.S. 252, 255, 58 S.Ct. 865, 82 L.Ed. 1323 (1938); Ex parte Poresky, supra note 17, 290 U.S. at 32, 54 S.Ct. 3, 78 L.Ed. 152; Bianchi v. Morales, 262 U.S. 170, 172, 43 S.Ct. 526, 67 L.Ed. 928 (1922); Norton v. Whiteside, 239 U.S. 144, 153, 36 S.Ct. 97, 60 L.Ed. 186 (1915); McGilvra v. Ross, 215 U.S. 70, 76, 77, 80, 30 S.Ct. 27, 54 L.Ed. 95 (1909)
 
 
 [21]
 Hearings Before the Senate Select Committee on Equal Educational Opportunity, 93rd Cong., 1st Sess. 1 (1971)
 
 
 [22]
 See D.C.Code Sec. 1-102 (1967); Maryland & District of Columbia Rifle & Pistol Ass'n v. Washington, 142 U.S.App. D.C. 375, 381, 382, 442 F.2d 123, 129-130 (1971)
 
 
 [23]
 See, e. g., Neild v. District of Columbia, 71 App.D.C. 306, 310-311, 110 F.2d 246, 250-251 (1940)
 
 
 [24]
 See Bradshaw v. United States, 143 U.S.App.D.C. 344, 443 F.2d 759, 765 n. 13 (1971). The federal contribution for the support of the District of Columbia during fiscal year 1968 was $613.9 million. H.R.Rep. No. 1609, 90th Cong., 2d Sess. 5 (1968)
 
 
 [25]
 The federal appropriation for public education in the District, including operating costs and capital expenditures, was $156.8 million for fiscal year 1968. Id
 
 
 [26]
 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)
 
 
 [27]
 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)
 
 
 [28]
 Green v. County School Bd., 391 U.S. 430, 437-438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). See also Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); McDaniel v. Barresi, 402 U.S. 39, 41, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971). See generally, Davis v. School Dist. of City of Pontiac, 309 F. Supp. 734, 443 F.2d 573, cert. denied, 404 U.S. 913, 91 S.Ct. 233, 30 L.Ed.2d 186 (1971); Bradley v. Milliken, 338 F. Supp. 582 (E.D.Mich., 1971); Bradley v. School Bd. of City of Richmond, Va., 338 F.Supp. 67 (E.D.Va., 1972)
 
 
 [29]
 Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967), aff'd sub nom. Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (en banc 1969)
 
 
 [30]
 269 F.Supp. at 503-506
 
 
 [31]
 Id. at 406
 
 
 [32]
 Id. at 426, 429
 
 
 [33]
 Id. at 502
 
 
 [34]
 Id. at 419-421, 504-505
 
 
 [35]
 Id. at 504, see also, Brown v. Bd. of Educ., supra note 26, 347 U.S. at 494, 74 S.Ct. 686
 
 
 [36]
 Id. at 517-518
 
 
 [37]
 Id. at 510, 515. This stemmed from a finding that remedies to correct past de jure segregation were inefficacious in light of the prevailing housing and economic patterns in the District. Id. at 515
 
 
 [38]
 Id. at 510
 
 
 [39]
 Id
 
 
 [40]
 See note 21, supra
 
 
 [41]
 Hobson v. Hansen, supra note 29, 269 F.Supp. at 510-511
 
 
 [42]
 Green v. County School Bd., supra note 28, 391 U.S. at 438 n. 4, 88 S.Ct. 1689, 20 L.Ed.2d 716
 
 
 [43]
 Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969)
 
 
 [44]
 Lee v. Nyquist, 318 F.Supp. 710 (W.D.N.Y.1970), aff'd, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971)
 
 
 [45]
 Supra note 43
 
 
 [46]
 See note 15, supra
 
 
 [47]
 387 U.S. at 373, 87 S.Ct. at 1630
 
 
 [48]
 Id. at 376, 87 S.Ct. at 1632
 
 
 [49]
 Id. at 378, 87 S.Ct. at 1633
 
 
 [50]
 Id. at 380, 87 S.Ct. at 1634
 
 
 [51]
 Id. at 381, 87 S.Ct. at 1634
 
 
 [52]
 Supra note 43
 
 
 [53]
 393 U.S. at 389-390, 89 S.Ct. 557
 
 
 [54]
 Id. at 389, 89 S.Ct. at 560
 
 
 [55]
 Id. at 390, 89 S.Ct. at 560
 
 
 [56]
 Supra note 44
 
 
 [57]
 Id. at 716. The Reitman case is cited supra note 43
 
 
 [58]
 Id
 
 
 [59]
 N.Y.Educ.Law Sec. 101 et seq. (McKinney's Consol.Laws, c. 16, 1969)
 
 
 [60]
 Id
 
 
 [61]
 Id. at 717
 
 
 [62]
 Id
 
 
 [63]
 Id. at 718
 
 
 [64]
 Supra note 43
 
 
 [65]
 Lee v. Nyquist, supra note 44, 318 F. Supp. at 718
 
 
 [66]
 Id. at 718-719. The court rejected, as irrelevant to the problem before it, the defendants' argument that the state had no duty to mitigate de facto segregation in the schools. Id. at 719. See text infra at notes 109-13. The court further held that no "compelling justification for the statutory classification" had been demonstrated. Id. See text infra at notes 67-70
 
 
 [67]
 Id. at 720
 
 
 [68]
 Id
 
 
 [69]
 Id
 
 
 [70]
 Id. See to same effect, Kennedy Park Homes Ass'n v. City of Lackawanna, N.Y., 436 F.2d 108 (2d Cir.), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Keyes v. School Dist. No. 1, Denver, Colo., 313 F.Supp. 61 (D.Colo.1970). Cf. Bradley v. Milliken, 433 F.2d 897 (6th Cir. 1970)
 
 
 [71]
 Supra note 43
 
 
 [72]
 Supra note 43
 
 
 [73]
 Supra note 44
 
 
 [74]
 Reitman v. Mulkey, supra note 43, 387 U.S. at 381, 87 S.Ct. 1627, 18 L.Ed.2d 830
 
 
 [75]
 Id
 
 
 [76]
 Id. at 378, 87 S.Ct. 1627
 
 
 [77]
 Hunter v. Erickson, supra note 43, 393 U.S. at 389, 89 S.Ct. 557
 
 
 [78]
 Id. at 390, 89 S.Ct. 557
 
 
 [79]
 Lee v. Nyquist, supra note 44, 318 F. Supp. at 718
 
 
 [80]
 See note 15, supra
 
 
 [81]
 Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943)
 
 
 [82]
 Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944)
 
 
 [83]
 Id
 
 
 [84]
 Bolling v. Sharpe, supra note 15, 347 U.S. at 499, 74 S.Ct. at 694
 
 
 [85]
 Hirabayashi v. United States, supra note 81, 320 U.S. at 100, 63 S.Ct. 1375
 
 
 [86]
 Loving v. Virginia, 388 U.S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967)
 
 
 [87]
 Id. See also Korematsu v. United States, supra note 82, 323 U.S. at 216, 65 S.Ct. 193
 
 
 [88]
 Hobson v. Hansen, supra note 29, 269 F.Supp. at 507
 
 
 [89]
 Supra note 43
 
 
 [90]
 Id. at 376, 87 S.Ct. 1627
 
 
 [91]
 Id. at 373, 87 S.Ct. 1627. To do this is not to violate the rule, discussed by my colleagues, ante, pp. 1102-1103, forbidding nullification of a statute simply because of the motives or purposes underlying it. See Palmer v. Thompson, 403 U.S. 217, 224, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); United States v. O'Brien, 391 U.S. 367, 382, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Yet one may wonder whether that rule has any real operation in the instant case. It rests on the basic premise, not that the legislature can act for unconstitutional purposes, but that "[i]nquiries into [legislative] motives or purposes are a hazardous matter." United States v. O'Brien, supra 391 U.S. at 383, 88 S.Ct. at 1682, leaving any constitutional decision on a shaky foundation. Such is not the situation, and the rule would seem inapplicable, where, as here, the legislation's moving spirit appears plainly and uncontrovertedly on the face of the legislative action. See Bush v. Orleans Parish School Bd., 187 F.Supp. 42 (E.D.La.1960), aff'd, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961). In any event, an argument for unconstitutionality on legislative motives or purposes per se would serve only to augment the Reitman-Hunter-Lee approach appellants make
 
 
 [92]
 Supra note 29
 
 
 [93]
 See text supra Part II
 
 
 [94]
 Comparable programs already existed in Rochester, Boston and Hartford. See, United States Commission on Civil Rights, Racial Isolation in the Public Schools, Vol. I (Wash.D.C.1967). The feature common to all is that the participants in each program are schools which are located in metropolitan or suburban areas contiguous to one another, but members of different school districts. Each is unable to provide integrated educational experiences without the coordinated efforts of the other
 The Rochester children, 25 first graders from racially imbalanced Rochester schools, attend schools in the suburbs. Each year 25 first graders are added to the program until the number of children participating will reach 300. Rochester pays the tuition and provides transportation for the participating children. Most of the costs of tuition and transportation are reimbursed by state and federal funds under Title I of the Elementary and Secondary Education Act of 1965, 79 Stat. 24, 35, 20 U.S.C.A. Sec. 241 et seq. (1969).
 A similar program operating in Boston was organized by the Metropolitan Council for Educational Opportunities (METCO). Two-hundred-twenty children from inner city schools are educated in suburban schools. The METCO program is funded by a private foundation, state assistance, and the United States Office of Education under Title III of the Elementary and Secondary Education Act, 79 Stat. 27, 39, 20 U.S.C.A. Sec. 841 et seq. (1969).
 In the Hartford metropolitan area 267 children from the city are educated in the schools in their surrounding suburban communities. The program, "Project Concern" is supported by federal and private foundation funds, and by money from the state and from the city of Hartford. Racial Isolation in the Public Schools, supra, pp. 151-53.
 See also, Serrano v. Priest, 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971) and Van Dusartz v. Hatfield, 334 F.Supp. 870 (D.C.Minn.1971) (educational appropriations based on local property taxes violate Equal Protection Clause.)
 
 
 [95]
 H.R.Rep.No.1609, 90th Cong., 2d Sess. 4-5 (1968)
 
 
 [96]
 "The concept of neighborhood schools has functioned successfully in this country for generations, and the present trend in the District of Columbia away from this time-honored precept, and of transporting children long distances across the city merely to achieve greater racial balance in some particular school is, in the opinion of your Committee, a completely indefensible waste of the tax-payers' money as well as detrimental to the children themselves." H.R.Rep.No.1609, 90th Cong., 2d Sess. 5 (1968)
 
 
 [97]
 82 Stat. 615, D.C.Code Sec. 31-1118 (Supp. IV 1971)
 
 
 [98]
 D.C.Code Sec. 31-1118(1) (Supp. IV 1971)
 
 
 [99]
 H.R.Rep.No.1609, 90th Cong., 2d Sess. 5 (1968)
 
 
 [100]
 S.Rep.No.1449, 90th Cong., 2d Sess. 18 (1968)
 
 
 [101]
 Id
 
 
 [102]
 H.R.Conf.Rep.No.1829, 90th Cong., 2d Sess. 7-8 (1968)
 
 
 [103]
 Reitman v. Mulkey, supra note 43
 
 
 [104]
 See Hobson v. Hansen, supra note 29, 269 F.Supp. at 510
 
 
 [105]
 North Carolina State Bd. of Educ. v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971)
 
 
 [106]
 See discussion in text supra at notes 45-51
 
 
 [107]
 Hunter v. Erickson, supra note 43, 393 U.S. at 389, 89 S.Ct. 557, 21 L.Ed. 2d 616
 
 
 [108]
 Id. To be sure, as my colleagues point out, ante pp. 1103, 1106, Section 401(2) facially specifies no racial distinction to be made among or within the regulated groups. But "although the law on its face treats Negro and white, Jew and gentile in an identical manner," the Constitution becomes implicated if "the reality is that the law's impact falls on the minority." Id. at 391, 89 S.Ct. at 560
 
 
 [109]
 Ante pp. 1100-1101. Like my colleagues, I see no issue before us as to whether the Board of Education is required to support the Bannockburn Plan, as distinguished from whether the Board can be hindered, by a statute operating discriminatorily, in supporting it. Put another way, no question arising from the Board's recent decision to terminate the Plan is properly presented by this appeal. It was for that reason that, after the Board so acted, we denied appellants' motion for a stay, which would have been tantamount to an order that the plan be maintained in operation. Bulluck v. Washington, supra note 5, at 1099-1100
 
 
 [110]
 Supra note 44
 
 
 [111]
 Id. at 719
 
 
 [112]
 Supra note 43
 
 
 [113]
 Lee v. Nyquist, supra note 44, 318 F. Supp. at 719. Nor can I agree with my colleagues that "the constitutional unit of equality here is the District itself. . . ." Ante p. 1106. The Board of Education, of course, is constitutionally obligated to make its educational offerings available to all District children without discrimination on the basis of color. E. g., Sweatt v. Painter, 339 U.S. 629, 634-636, 70 S.Ct. 848, 94 L.Ed. 1114 (1950). That, however, is not the full measure of governmental responsibility, which includes prominently the duty not to subject the solution of the public schools' racial problems to significantly more demanding criteria. See text supra at notes 74-88. Moreover, the Federal Government's due process obligations are nationwide. In appropriate situations the standard of comparison thus becomes the benefit which the Federal Government confers upon similarly situated children anywhere. Cf. United States v. Thompson, 147 U.S.App.D.C. 1, 452 F. 2d 1333 (1971). While nothing which would invoke that standard has emerged in the instant case, it is worth noting that Section 401(2) pens the great bulk of District children within the geographical confines of the District and thus precludes their access to federally-assisted programs elsewhere
 
 
 [114]
 Loving v. Virginia, supra note 86, 388 U.S. at 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010. See also Korematsu v. United States, supra note 82, 323 U.S. at 216, 65 S.Ct. 193, 89 L.Ed. 194
 
 
 [115]
 McLaughlin v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964)
 
 
 [116]
 Hobson v. Hansen, supra note 29, 269 F.Supp. at 507
 
 
 [117]
 Lee v. Nyquist, supra note 44, 318 F.Supp. at 720
 
 
 [118]
 Hobson v. Hansen, supra note 29, 269 F.Supp. at 507
 
 
 [119]
 H.R.Rep.No.1609, 90th Cong., 2d Sess. 4-5 (1968)
 
 
 [120]
 Id
 
 
 [121]
 Murray's Lessee v. Hoboken Land and Improvement Co., 59 U.S. (18 How.) 272, 276, 15 L.Ed. 372 (1855)
 
 
 [122]
 E. g., Shapiro v. Thompson, supra note 18, 394 U.S. at 641, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600. Similarly, "Congress is without power to enlist state cooperation in a joint federal-state program by legislation which authorizes the States to violate the Equal Protection Clause." Id
 
 
 [123]
 See generally, Shapiro v. Thompson, supra note 18
 
 
 [124]
 See Heiner v. Donnan, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1931)
 
 
 [125]
 See text supra at note 95
 
 
 [126]
 See text supra at note 11
 
 
 [127]
 See Bulluck v. Washington, supra note 5, at 1100-1101 n. 8
 
 
 [128]
 Hearings Before the Senate Select Committee on Equal Education, 93rd Cong., 1st Sess. 1 (1971)
 
 
 [129]
 H.R.Rep.No.1609, 90th Cong., 2d Sess. 1 (1968); S.Rep.No.1448, 90th Cong., 2d Sess. 1 (1968)
 
 
 [130]
 See Bulluck v. Washington, supra note 5, at 1100-1101 n. 8
 
 
 [131]
 See note 25, supra
 
 
 [132]
 Compare, e. g., Shapiro v. Thompson, supra note 18; Harper v. Virginia Bd. of Education, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), in each of which legislation either augmenting public revenues or curtailing public expenditures was struck down
 
 
 [133]
 See cases cited supra notes 116-118
 
 
 [134]
 A systemwide per-pupil cutback to accommodate $58,800-the expense of the Bannockburn project-in a multimillion dollar budget would have been infinitesimal
 
 
 [135]
 Brown v. Board of Education, supra note 2, 347 U.S. at 493, 74 S.Ct. at 691. The Court continued:
 Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.
 Id.
 
 
 [136]
 Lee v. Nyquist, supra note 44, 318 F.Supp. at 714
 
 
 [137]
 E. g., Brown v. Board of Educ., supra note 26, 347 U.S. at 494, 74 S.Ct. 686
 
 
 [138]
 See the authorities cited in Hobson v. Hansen, supra note 29, 269 F.Supp. at 504-505 ns. 185-194
 
 
 [139]
 Jackson v. Choate, 404 F.2d 910, 913 (app.) (5th Cir. 1968)
 
 
 [140]
 See text supra at note 20